United States Court of Appeals,

Fifth Circuit.

No. 91–4618

Summary Calendar.

Marilyn WILSON, Plaintiff–Appellant,

v.

UT HEALTH CENTER, UT System Police Department, Etc., et al., Defendants–Appellees.

Oct. 6, 1992.

Appeal from the United States District Court for the Eastern District of Texas.

Before REAVLEY, HIGGINBOTHAM and BARKSDALE, Circuit Judges.

REAVLEY, Circuit Judge:

Marilyn Wilson contends that officials of the University of Texas Health Center (UTHC) demoted and discharged her from her position as a sergeant in retaliation for her reports of sexual harassment within the UTHC police force. At the close of Wilson's case-in-chief, the district court granted all defendants a directed verdict on Wilson's First Amendment and due process claims under 42 U.S.C. § 1983 and on her defamation claim under Texas law. After considering both sides' evidence, the district court entered judgment against Wilson on her claim under 42 U.S.C. § 2000e *et seq.* (Title VII) 773 F.Supp. 958. We affirm in part and reverse in part to allow a jury to consider Wilson's First Amendment and defamation claims against some defendants.

I. BACKGROUND

The events that occasioned this controversy occurred on UTHC's Tyler, Texas campus between August 1986 and March 1987. During that time, uncontroverted evidence establishes that UTHC police officers commonly used sexually suggestive language in communicating with one another. Wilson claims that UTHC officials disciplined her for reporting various incidents of sexual harassment. The officials claim that they disciplined Wilson because she made several misrepresentations in reporting those incidents to her immediate supervisor, police chief and

defendant John Moore, and in appealing from disciplinary action that Moore took against her.

Wilson's troubles began in August 1986 when she brought a camera lens to the UTHC campus so that her co-worker and subordinate, defendant Chester Davis, could evaluate it.[1] Wilson claims that, instead of going to a hilltop to view the lens, Davis took her to a secluded place, grabbed her and kissed her on the neck despite her protestations and said that he would have his way with her. Davis denies any such contact or statement.

Almost one month later, Wilson reported the incident to UTHC's Acting Director of Personnel, Sharon Briery, who advised that she see Chief Moore. According to Moore's instructions, Wilson prepared a written report of the incident and also detailed incidents of Davis's verbal sexual misconduct toward three other UTHC employees. Davis admitted harassing one of these employees and Moore suspended him three days without pay for making sexually suggestive comments to women.[2] Moore also issued a letter of reprimand to Wilson for waiting so long to report Davis' conduct, stating:

> You, as a supervisor and an officer, have a duty to speak out. You cannot unclothe yourself of duty at your convenience. In this matter, you undressed yourself of responsibility both mentally and administratively by alleging intimidation and by waiting twenty-eight days before taking any action and/or reporting the incident to me.

Meanwhile, on October 30, 1986, Wilson went to Moore and said that she had hearsay evidence that Officer Bill Glover had been harassing two other UTHC employees, including Nancy Simms. Moore asked Wilson to investigate further, and he testified that he immediately reprimanded Glover. Wilson submitted a letter to Moore concerning Glover's requests that Simms spend time with him outside work and Glover's expenditure of inordinate amounts of time at Simms' place of work.

---

[1] Davis and Wilson had some disagreements in 1984, but there was evidence that by August 1986 they appeared to be friends. For example, they bowled on a team together.

[2] Davis has also acknowledged such antics as giving black panties to a married woman, but the record does not show that he was reprimanded for any of these other sexually suggestive incidents.

Glover admitted asking Simms out for coffee, but denied many aspects of Wilson's report, including that he flirted with Simms. At a subsequent meeting with Moore and Wilson, and later at trial, Simms agreed with Glover's version of events and identified several exaggerations in Wilson's report.

On February 5, 1987, Moore issued Wilson a letter of reprimand, suspended her for ten days without pay, and reduced her in rank from sergeant to police officer. In his letter, Moore cites several incidents beginning in 1984 and concluding with the Glover incident in which he understands Wilson to have lied and maliciously maligned her fellow officers. Wilson indicated that she had read and understood Moore's letter by signing it, and then she signed a Personnel Disciplinary Report (PDR) form that Moore prepared concerning the matter for submission to the University System Police in Austin, Texas.

The PDR that Wilson signed for Moore (Moore's PDR) references attached documentation. Wilson asked to see the attachments and to have a copy of the PDR. Moore refused, but he allowed Wilson to copy the sparse information from the PDR by hand. She then paraphrased this information on a new PDR form (Wilson's PDR). Wilson gave Wilson's PDR to her attorney. At a subsequent hearing that constituted part of Wilson's appeal of her demotion, Wilson's attorney demanded the attached documentation from Moore's supervisor, defendant Ron Mays. Wilson's attorney presented Mays with Wilson's PDR without stating that it was not an exact duplicate of Moore's PDR.

Mays took Wilson's PDR to Moore and asked for the attached documentation that it referenced. Moore did not recognize Wilson's PDR as the one he prepared. He and Mays compared the PDRs and discovered that they did not match. Two days later, on March 5, 1987, Moore presented Wilson with a letter of termination, citing Wilson's continued misrepresentations in the PDR incident as the reason for her discharge.

Wilson appealed her termination through UTHC channels and ultimately sued Davis, Moore,

Mays, Henry Jackson (UTHC's Director of Equal Employment Opportunity), and George Hurst (UTHC's Director), among others, for, *inter alia,* depriving her of constitutional rights to free speech and due process, defamation, and retaliatory discharge in contravention of Title VII.

After Wilson's case-in-chief,[3] the district court directed a verdict against Wilson 1) on her First Amendment claim after holding that Wilson's speech regarded a matter of insufficient public concern to merit protection, 2) on her due process claim after holding that Wilson received constitutionally sufficient process, and 3) on her defamation claim after holding that Wilson produced insufficient evidence of malice on the defendants' part. The court then continued the trial to resolve Wilson's Title VII retaliatory discharge claim and entered judgment against Wilson after hearing the evidence. The court found that Wilson made misrepresentation in her report about Glover and that Moore demoted her because of those misrepresentations, and then terminated her because she misrepresented the authenticity of the PDR that her attorney handed to Mays.

## II. DISCUSSION

A. TITLE VII

Wilson tried her Title VII claim to the court as required by statute before Congress permitted jury trials of these cases in the Civil Rights Act of 1991. Our precedent precludes us from heeding Wilson's suggestion that we accord retroactive effect to the jury trial provision of the Civil Rights Act of 1991. *Landgraf v. USI Film Products,* 968 F.2d 427, 432–33 (5th Cir.1992).

Wilson argues that the district court applied the wrong legal standard in deciding that she was not discharged in retaliation for reporting sexual harassment as prohibited by 42 U.S.C. § 2000e–3(a). First, she claims that the court ignored the distinction between the truth of her charges and her belief in the truth of her charges. *See De Anda v. St. Joseph Hosp.,* 671 F.2d 850, 853 n. 2 (5th Cir.1982) ("reasonable belief" that employer engages in discriminatory practices sufficient to invoke Title VII

[3]The district court heard the testimony of Moore, Wilson, Jackson, and Davis.

protection); *Berg v. La Crosse Cooler Co.,* 612 F.2d 1041, 1045–46 (7th Cir.1980) (employee who makes good faith, reasonable charges that employer's practice violates Title VII is protected from retaliatory discharge though charges unfounded). But the court found the opposite of good faith on Wilson's part; it found that she knowingly made several misrepresentations to Moore, which caused her demotion and termination.

The court's findings also destroy Wilson's contention that she is entitled to recover under Title VII even if the defendants discharged her for both legitimate *and* illegitimate reasons. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 241, 109 S.Ct. 1775, 1785, 104 L.Ed.2d 268 (1989) ("Title VII meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations"). The court concluded that Wilson did not prove that her reports of sexual harassment caused her termination and that her misrepresentations did.

Wilson next argues that the fact findings on which the court based its Title VII judgment are clearly erroneous. Our review of the record convinces us that ample evidence supports both Wilson's and the defendants' opposite positions concerning the reasons for the disciplinary action taken against Wilson. We are bound in such cases to defer to the credibility determinations of the trier of fact.

Finally, Wilson argues that *Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998 (5th Cir.1969), requires a different standard than that applied by the district court to decide whether the defendants disciplined her for legitimate or illegitimate reasons. She claims that *Pettway* interprets Title VII to prevent an employer from making a disciplinary decision based on its evaluation of the veracity of an employee's allegations that concern an activity that Title VII protects, such as complaints about sexual harassment. No court has read *Pettway* so broadly, and we see no justification for doing so now.

*Pettway* concerns a letter written by Peter Wrenn to the chairman of the Equal Employment

Opportunity Commission (EEOC) in which Wrenn complained of his employer's discriminatory practices. Wrenn's employer got a copy of the letter and discharged him for making misrepresentations in the letter. This court held that "where, disregarding the malicious material contained in a charge (or ... other communication with EEOC sufficient for EEOC purposes, or in a proceeding before EEOC) the charge otherwise satisfies the liberal requirements of a charge, the charging party is exercising a protected right under [Title VII]." *Id.* at 1007. The *Pettway* court understood that if it did not protect employee statements in EEOC proceedings, the EEOC's ability to administer Title VII would be impaired. *Id.* at 1005. Applying its understanding of the law, the *Pettway* court found that Wrenn's submission of the letter to the EEOC was protected by Title VII and his employer violated that statute by discharging him for making misrepresentations in the letter, even if a court later agreed with the employer that Wrenn's statements were misrepresentations. *Id.* at 1007–08.

*Pettway* does not protect Wilson from the consequences of any misrepresentations that she made to Moore or Mays, because she made any such misrepresentations outside the context of any EEOC proceeding. The *Pettway* court expressly refused to "decide whether a writing purporting to be and to be used as a charge, which does not meet the requisites of a charge such as is required to set the EEOC machinery in operation is protected." *Id.* at 1007. Thus, *Pettway* only protects employees from retaliation for misrepresentations made in *certain* documents or statements *in EEOC proceedings. Pettway's* rationale entirely depends on EEOC's function in the administration of Title VII, so we cannot extend *Pettway's* holding to extra-EEOC proceedings without a reason for doing so.

We thus affirm the district court's judgment dismissing Wilson's Title VII claims.

B. SECTION 1983

*1. First Amendment*

Wilson claims that the defendants deprived her of her constitutional right to free speech under color of law in contravention of 42 U.S.C. § 1983 by discharging her in retaliation for her speech about sexual harassment by UTHC police officers. This claim resembles Wilson's Title VII claim, but Title VII does not preempt a collateral section 1983 action based on the same incident. *Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1573–76 (5th Cir.1989), *cert. denied,* 493 U.S. 1019, 110 S.Ct. 718, 107 L.Ed.2d 738 (1990). The district court directed a verdict against Wilson on her First Amendment claim after ruling that her speech concerned a matter of insufficient public concern to merit constitutional protection.

"[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters *only* of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983) (emphasis added). Exercising *de novo* review, "we decide whether speech addresses a matter of public concern with reference to the "content, form and context of a given statement, as revealed by the whole record.' " *Johnston,* 869 F.2d at 1577 (quoting *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690).

The content of Wilson's speech—reports of sexual harassment perpetrated on her and other women at UTHC[4]—is of great public concern. *Cf. Connick,* 461 U.S. at 148, 103 S.Ct. at 1691 n. 8 (plaintiff's constitutional "right to protest racial discrimination [is] a matter inherently of public concern," citing *Givhan v. Western Line Consolidated School Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979)).

---

[4]The defendants argue that the falsity of Wilson's charges forfeits any constitutional protection that they would otherwise enjoy. But, as we stated in our discussion of Wilson's Title VII claim, the evidence in this case conflicts on the veracity of Wilson's statements. Before the district court directed a verdict on Wilson's First Amendment claim under section 1983, a jury sat as the trier of fact for this claim. Thus, the district court's findings as to Wilson's Title VII claim do not apply to her section 1983 claim.

The defendants rely on *Terrell v. University of Texas System Police,* 792 F.2d 1360 (5th Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987) in arguing that Wilson's speech was not of public concern. The *Terrell* court held that the speech at issue was not of public concern in part because the speech consisted exclusively of criticisms of the competence of the speaker's supervisor. *Id.* at 1362; *see also Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91 (employee intra-office questionnaire was not speech of public concern inasmuch as questionnaire sought employee opinions on office's transfer policy). *Terrell* and *Connick* are thus distinguishable because the *only* reason that the public would be concerned about the speech there at issue was because it involved a public workplace. *See Terrell,* 792 F.2d at 1362 ("almost anything that occurs within a public agency *could* be of concern to the public"). This court before has cited *Terrell* in identifying this critical distinction between speech concerning personnel policies and that concerning public official misconduct, and designated the latter of "public concern." *Brawner v. City of Richardson, Tex.,* 855 F.2d 187, 191–92 & nn. 10–14 (5th Cir.1988).

The defendants also argue that because Wilson acknowledged some duty as a police officer to report sexual harassment, she made the reports as an employee, not as a citizen. But practically, such a rule would permit public employers to remove constitutional protection from speech on certain subjects by including those subjects within employees' reporting duties. Any employer can require employees to report sexual harassment; because some forms of harassment are not criminal offenses, the reporting of harassment does not fall within the special province of police officers. Thus, the rule proposed by the defendants could ironically facilitate the suppression of speech through a requirement that the speech be made.

We return to *Connick* to determine the significance of an employee's duty to speak in the "public concern" determination. *Connick* "hold[s] only that when a public employee speaks *not* as a citizen upon matters of public concern, but *instead* as an employee upon matter only of personal interest," the First Amendment does not protect the employee from discipline for speaking. 461 U.S.

at 147, 103 S.Ct. at 1690 (emphasis added). The words "not" and "instead" in this key statement can only mean that the Court removed from First Amendment protection only that speech that is made *only* as an employee, and left intact protection for speech that is made both as an employee and as a citizen.

We think that Wilson made her reports of sexual harassment both as a citizen and an employee. She contends that she started her reports after personally experiencing considerable harassment, and obviously had a stake as an individual citizen in having that conduct stopped, regardless of whether her reports also coincided with her job responsibilities.

Nor did Wilson forfeit her right to speak by choosing an internal forum to speak as a citizen about sexual harassment within the UTHC police force. *See Givhan,* 439 U.S. at 415–16, 99 S.Ct. at 696–97; *see also Johnston,* 869 F.2d at 1577 (employee's testimony in a closed hearing convened to review intragovernment employment dispute is of public concern, and therefore protected speech). Having considered the jurisprudence and the parties' contentions, we conclude that the district court erred in holding that Wilson's speech was not of public concern.

Though the speech of public employees may be of public concern, that speech still does not enjoy First Amendment protection if legitimate government interests in limiting the speech outweigh the employees' interest in speaking. *See Connick,* 461 U.S. at 150–51, 103 S.Ct. at 1691–92 (citing *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). The defendants invite us to affirm the district court's dismissal of Wilson's First Amendment claim on the ground that her interest in reporting sexual harassment is outweighed by UTHC's interest in eliminating dissension among its employees and in providing efficient police protection. We cannot accept this invitation because the defendants prematurely assume a finding that Wilson did not speak in good faith. If a jury determines that she reported sexual harassment in good faith, then UTHC's interest in maintaining a police force that is free of sexual intimidation, which Wilson's good faith

reports would serve, outweighs any interest in departmental efficiency and harmony.

Finally, the defendants argue that Wilson produced insufficient evidence that they retaliated against her for her speech, so we may affirm the district court's directed verdict on this ground. After reviewing the record, we agree as to defendants Davis and Hurst. Moore and Mays decided to discipline Wilson and Jackson reviewed that decision, so each could have retaliated against Wilson for her protected speech. And any retaliation for Wilson's speech on a matter of such prominent public concern as workplace sexual harassment represents a violation of a clearly established right, so under *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), these defendants are not entitled to qualified immunity. On remand, a jury will decide whether they in fact retaliated against Wilson for her protected speech.

*2. Due Process*

The district court directed a verdict against Wilson on her due process claim under section 1983 after ruling that Wilson's own evidence showed that she received constitutionally sufficient process in each instance in which the defendants took disciplinary action against her. Wilson argues that she received insufficient pre-disciplinary process. But even when a government terminates an employee, the Constitution only requires notice and an opportunity to respond prior to termination. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). The record establishes that Wilson got this much process in each instance in which the defendants disciplined her. We thus affirm the district court's judgment as to Wilson's due process claim under section 1983.

C. DEFAMATION

Wilson claims that the court erred in directing a verdict against her on her defamation claims against Mays and Moore under Texas law. The court held that Wilson could not prevail because she adduced insufficient evidence of malice. *See Ramos v. Henry C. Beck Co.,* 711 S.W.2d 331, 335

(Tex.App.—Dallas 1986, no writ) (privilege for employer's accusations against employee, made to person with common interest in employee's discharge, lost if plaintiff carries burden of proving that communication made with malice). In considering a motion for a directed verdict in a jury trial, the court must "consider all the evidence ... in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting the motion[ ] is proper." *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc). We apply this same standard in reviewing the district court's decision. *Id.* at 377.

Applying the *Boeing* standard, we think that Wilson presented sufficient evidence of malice to survive summary judgment. Mays and Moore portrayed Wilson as a forger and a liar in her letter of termination. Wilson testified that neither of these were true and asked the jury to infer that Moore and Mays said these things to justify terminating her when they really wanted to discharge her for reporting sexual harassment. Based on the evidence presented, the jury was entitled to accept this version of events and find that Moore and Mays acted with malice.

The defendants claim that, under *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 101–02, 104 S.Ct. 900, 908–909, 79 L.Ed.2d 67 (1984), the Eleventh Amendment precludes the district court from exercising jurisdiction over Wilson's state-law defamation claim against state officials. But the district court dismissed all claims against UTHC and the defendants in their official capacities before directing a verdict on the defamation claim as to Moore and Mays in their individual capacities. *Pennhurst* and the Eleventh Amendment do not deprive federal courts of jurisdiction over state law claims against state officials strictly in their individual capacities. *Voisin's Oyster House, Inc. v. Guidry,* 799 F.2d 183, 187–88 (5th Cir.1986). Thus, the district court properly exercised jurisdiction over Wilson's defamation claims against Mays and Moore.

## III. CONCLUSION

We REVERSE the district court's judgment insofar as it dismisses Wilson's First Amendment claims under section 1983 against Jackson, Mays, and Moore, and insofar as it dismisses Wilson's defamation claims against Mays and Moore. We AFFIRM the court's judgment in all other respects. We REMAND this case for further consideration.