**NEW TIMES, INC. d/b/a Dallas Observer; Mark Stuertz; Lena Rumore Waddell, Lou Saba; and Jack Sands, Appellants,**

v.

**Dale F. WAMSTAD, Appellee.**

**No. 05–02–01423–CV.**

Court of Appeals of Texas, Dallas.

June 13, 2003.

J. Michael Tibbals, Joseph A. Barbknecht, J. Brantley Saunders, The Barbknecht Firm, P.C., David G. Allen, Stacy & Conder, L.L.P., Charles L. Babcock, Jim (James) McCown, Jackson & Walker, LLP, Dallas, for appellants.

Alan S. Loewinsohn, Loewinsohn & Flegle, L.L.P., Dallas, for appellee.

Before Justices MOSELEY, O'NEILL, and LAGARDE.[1]

## OPINION

Opinion by Justice O'NEILL.

This case concerns a defamation suit brought by restaurateur Dale Wamstad after a detailed article about him appeared in the *Dallas Observer*. Wamstad named as defendants parties associated with the media as well as individuals. All Defendants sought summary judgment, which the trial court denied, and all Defendants appealed. We conclude that Wamstad is a limited public figure, that all Defendant–Appellants conclusively negated the element of "actual malice," which Wamstad

1. The Honorable Sue Lagarde, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

did not successfully controvert, thus entitling them to summary judgment as a matter of law. Accordingly, we reverse and render judgment for all Appellants.

## Facts

In its edition dated March 16–22, 2000, the *Dallas Observer* published an article ("the Article") about Dale Wamstad, entitled, "Family Man," with the caption on the cover stating, "Dallas Restaurateur Dale Wamstad portrays himself as humble entrepreneur and devoted father. The family he abandoned in New Orleans has a bone to pick with that." The Article is largely a recounting of various interactions with Wamstad as told by his ex-wife, his first-born son Roy, and some of Wamstad's former business associates. Wamstad's ex-wife, Lena Rumore, describes alleged incidents of Wamstad's physical abuse of her, her shooting of Wamstad in 1985, and the ensuing trial in which she was acquitted based on self-defense. She also describes her subsequent divorce from Wamstad in 1987 and her post-divorce suit against Wamstad in 1995, alleging that he defrauded her with respect to her earlier community-property settlement.[2] Trial in that case was pending at the time the Article was published. Roy Wamstad describes specific incidents in which he asserts his father physically and emotionally abused him.

The Article also describes numerous disputes former business partners had with Wamstad, many of which resulted in lawsuits. Six different former business associates, including Lou Saba and Jack Sands, recount their view of their business dealings with Wamstad and how they came to feel that Wamstad took advantage of them.[3] The Article also describes Wamstad's litigation with his long-time rival Ruth Fertel, of Ruth's Chris Steakhouse. Wamstad's Dallas Del Frisco's restaurant regularly appeared near the top of the "Knife and Fork Club of America's" top-ten list of steakhouses in the country ("Top–Ten List"). Wamstad reproduced the list in his advertising, particularly in airline magazines, reportedly with great success. Fertel suggested, in a newsletter to her customers, that the Top–Ten List was a front for Del Frisco's. Wamstad sued Fertel for defamation, and Fertel countersued for false advertising and unfair competition. The lawsuit was eventually settled.

Although as a whole the Article is unfavorable to Wamstad, it states that Wamstad "both in media interviews and under oath in court has steadfastly denied ever abusing any member of his family." It also includes favorable statements about Wamstad made by his current father-in-law. Stuertz states in his affidavit that he had arranged an interview with Wamstad, but Wamstad later canceled it on advice of his attorney. Wamstad asserts Stuertz mentioned Rumore's pending lawsuit to him but did not tell him he planned to cover Wamstad's business dealings as well.

Wamstad sued New Times, Inc. d/b/a *Dallas Observer* (the *Observer*) and Mark Stuertz, the reporter (collectively, "Media Defendants"). Wamstad also sued Rumore, Saba, and Sands (collectively, "Individual Defendants"). He challenged nearly all of the statements in the Article as

2. Rumore filed the suit shortly after Wamstad sold his interest in Del Frisco's restaurants for nearly $23 million. She alleged Wamstad had defrauded her with respect to her earlier property settlement, in 1992, for $45,000.

3. The record refers to Wamstad's involvement in at least ten restaurants since 1977 and contains court documents concerning legal disputes over at least four different restaurants, involving four different former associates.

defamatory, as well as other statements the Individual Defendants allegedly made to Stuertz that did not appear in the Article (collectively, "Statements"). All Defendants brought motions for summary judgment, which the trial court denied, and all Defendants brought this interlocutory appeal. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(6) (Vernon Supp.2003).

## Standard of Review

Each Defendant filed a traditional motion for summary judgment under rule 166a(c) of the Texas Rules of Civil Procedure.[4] Tex.R. Civ. P. 166a(c). The standards for reviewing summary judgment under rule 166a(c) are well established. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). To prevail on summary judgment, a defendant must either disprove at least one element of each of the plaintiff's theories of recovery or plead and conclusively establish each essential element of an affirmative defense, thereby rebutting the plaintiff's cause of action. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex.1979). Once the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact, thereby precluding summary judgment. *Id.* In deciding whether a genuine issue of material fact exists, we take evidence favorable to the non-movant as true; we indulge every reasonable inference, and resolve any doubt, in favor of the non-movant. *Nixon*, 690 S.W.2d at 548–49.

## Legal Principles Governing Defamation and Public–Figure Status

■ To maintain a defamation cause of action, the plaintiff must prove that the defendant (1) published a statement (2) that was defamatory concerning the plaintiff (3) while acting with either actual malice, if the plaintiff was a public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998).

■ Whether a party is a public figure is a question of constitutional law for courts to decide. *Id.*, (citing *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433 (5th Cir.1987)). "General-purpose" public figures are those individuals who have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts. *Id.* (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). "Limited-purpose" public figures are only public figures for a limited range of issues surrounding a particular public controversy. *Id.* The supreme court has adopted the Fifth Circuit's three-part test for a limited-purpose public figure:

(1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;

(2) the plaintiff must have more than a trivial or tangential role in the controversy; and

(3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*Id.* (citing *Trotter*, 818 F.2d at 433; *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296–98 (D.C.Cir.1980)).

**4.** Certain Defendant–Appellants filed no-evidence motions for summary judgment under rule 166a(i), which we need not address because we dispose of all issues based on Defendants' traditional motions for summary judgment under rule 166a(c).

Concerning the first element, a general concern or interest does not constitute a "controversy." *Waldbaum*, 627 F.2d at 1297. "To determine whether a controversy existed, and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question." *Id.* "The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment." *Id.*, *quoted approvingly in McLemore*, 978 S.W.2d at 572.

The second element requires that the plaintiff have more than a trivial or tangential role in the controversy. *McLemore*, 978 S.W.2d at 572–73. Several inquiries are relevant in examining the libel plaintiff's role in the controversy: "(1) whether the plaintiff sought publicity surrounding the controversy, (2) whether the plaintiff had access to the media, and (3) whether the plaintiff voluntarily engaged in activities that necessarily involved the risk of increased exposure and injury to reputation." *Id.* at 573 (citations omitted). " 'By publishing your views you invite public criticism and rebuttal; you enter voluntarily into one of the submarkets of ideas and opinions and consent therefore to the rough competition in the marketplace.' " *Id.* (quoting *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir.1996)).

The contours of the controversy requirement are at least partly defined by the notion that public-figure status attaches to those who "invite attention and comment" because they have thrust themselves to the forefront of a public controversy "to influence the resolution of the issue involved." *Gertz*, 418 U.S. at 345, 94 S.Ct. 2997. Public figures have "assumed the risk of potentially unfair criticism by entering into the public arena and engaging the public's attention." *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 273 (3d Cir.1980) (intensive advertising and continuing access to media made libel plaintiff a limited public figure). *See also Brueggemeyer v. Am. Broad. Cos.*, 684 F.Supp. 452, 458 (N.D.Tex.1988) (businessman, the subject of consumer complaints and suits, was public figure because by his conduct he "voluntarily engaged in a course that was bound to invite attention and comment").

## The Parties' Arguments

Appellants argue that Wamstad is a public figure, and thus he has the burden to show that each Defendant–Appellant published the Statements attributable to him or her with actual malice. Wamstad asserts he does not meet the public-figure test, because there is no "public controversy." He argues that the challenged Statements do not concern the previous controversy over the Top–Ten List and his previous marital difficulties and his participation in business-related litigation are personal disputes and do not constitute a public controversy.

## Media Coverage of Wamstad

The record evidence shows that around the time Rumore was tried for shooting Wamstad, in 1986, he began to receive considerable press attention concerning his domestic life. One article in the New Orleans *Times–Picayune*, entitled "Wounded husband called 'a raging bull,' " quoted testimony from the trial of at least three witnesses who described instances they witnessed of Wamstad's physical abuse of Rumore before the shooting. The article also stated that son Roy Wamstad recounted at least eleven separate instances in which he asserted Wamstad physically abused him and his mother. Even after Rumore was acquitted based on self-defense, the New Orleans press continued to

cover the couple's subsequent suits against each other, including Wamstad's suit in 1997 against Rumore for damages from shooting him and Rumore's subsequent countersuit for $5 million.

Thereafter, Wamstad married again, and began operating Del Frisco's restaurants in Dallas. The record contains numerous references to Wamstad throughout the 1990s, many appearing in the restaurant critic columns, which make frequent references to Wamstad personally. Through the 1990s, Wamstad advertised in both print media and radio, using an image of himself as a family-man and folksy steakhouse owner to promote his restaurants. The record contains numerous advertisements containing pictures of Wamstad's new family and children; many advertisements contain his signature slogan "We're open six evenings. I spend Sundays with my family." After he sold his interest in Del Frisco's, Wamstad continued to use his "family values" to promote his new restaurant, III Forks, which he opened in 1998.[5]

The press reported on a number of Wamstad's business disputes, particularly those with a personal edge to them. For example, in the fall of 1989, the Dallas press carried at least four articles discussing the business-turned-legal dispute between Wamstad and Mike Piper, his former attorney, after Piper acquired a Del Frisco's restaurant from Wamstad. When Piper moved his restaurant, Wamstad re-opened a Del Frisco's in the original location. The *Dallas Times Herald* published two pieces on the dispute, one entitled "Dueling Steak Knives." The *Dallas Morning News* also covered the story, quoting Piper's and Wamstad's personal comments about each other.[6]

In 1995, Wamstad's business and personal reputation gained national press attention when he sued Ruth Fertel for defamation over her suggestion that Wamstad was behind the "Top–Ten List." The evidence includes an Associated Press article, from November 1994, that chronicled the long-standing personal rivalry between Fertel and Wamstad[7] and also reported

5. Wamstad opened III Forks in August 1998 and sold it in July 2000. The record includes the following radio advertisement for III Forks, featuring his children from his current marriage, with Wamstad making reference to his wife Colleen:
 Dale: Hey kids. How are you doing?
 Child 1 (Dale, Jr.): Hi, daddy.
 Child 2 (Shelby Rose): Hi, daddy.
 C1: Daddy, why is III Forks called III Forks?
 Dale: Well, Dale, before Dallas was Dallas, it was a III Forks territory.
 C1: Daddy, why don't the steaks at III Forks sizzle?
 Dale: Well, honey, when butter starts to sizzle, it's turning to grease.
 C2: Oh, my gosh. Grease will kill you.
 Dale: That's right, Shelby Rose ... And Dale and Shelby Rose, thanks for helping me out today. Anything else you'd like to say?
 C1: I love you, Mom and Dane.
 C2: I love you, Mommy and Dane.
 C1: I love you, Nanny.
 C2: I love you, Nanny.
 Dale: And to Colleen ... (music and lyrics) it's a sin, my darling, how I love you.

6. The articles quoted Piper as saying he got involved with Wamstad in 1985 "when Dale's wife shot him" and states that Piper showed the reporter the 1986 "raging bull" article from the *Times–Picayune*. Wamstad responded that Piper was treacherous and mean-spirited for raising the shooting, adding that the shooting was all behind him, that he had remarried and had a wife and two beautiful kids. He went on to add that Piper was "a piece of snot floating in the ocean."

7. The feud reportedly began in 1981 when Wamstad claimed Fertel's son had slipped her recipes to him. It reportedly escalated from there. The AP article quoted Fertel as telling Rumore after the shooting that if she fired that many shots at Wamstad and didn't get him, Fertel was going to have to give Rumore shooting lessons.

Fertel's allegation that Wamstad was behind the supposedly independent Top–Ten rating. The AP article was picked up by numerous Texas newspapers, as well as newspapers in Charleston, Fort Lauderdale, Chicago, Baton Rouge, and Phoenix. *Texas Monthly* and at least one trade magazine covered the suit with Fertel, as did ABC World News Tonight. Subsequently, in 1995, the press reported that Wamstad dropped the libel suit to facilitate his $23 million sale of Del Frisco's to a national chain. Again, the press covered the personal aspects of the rivalry between the parties, reporting that both sides claimed total victory.[8]

In 1998, the Dallas press covered the run-up to, and opening of, Wamstad's III Forks restaurant. Sometime after the opening, the *Dallas Business Journal* and the *Observer* covered yet another of Wamstad's business disputes—again focusing on the personal aspects of the dispute— this time with rival steakhouse-owner Richard Chamberlain. In an advertisement in the *Dallas Morning News*, Wamstad reportedly "blasted" Chamberlain for picking on Dee Lincoln, Wamstad's former partner and current manager of a Del Frisco's restaurant.[9] Chamberlain expressed the view that Wamstad wanted to create some publicity for his new steakhouse and was doing it at the expense of Chamberlain's reputation. (When asked to comment for the newspaper articles, Wamstad told one newspaper that "the

matter is over" and refused to return calls to the other.)

In the mid–1990s, the press began referring to Wamstad as "flamboyant" and "controversial." For example, in 1995, the *Dallas Morning News* described Wamstad as "a colorful and controversial member of the Dallas restaurant scene since arriving from New Orleans in 1989." In 1996, the Dallas press noted that Wamstad was "known for getting embroiled in legal battles with former business partners and rival steakhouse chains." And the evidence shows that Wamstad used his access to the media to comment on his rivals and his business disputes. For example, at the time of the dispute with Piper, the Dallas press reported that Wamstad ran an advertisement stating, "I've done some stupid things in my life, but selling my steakhouse to my attorney has to top the list" and another one in which he accused Piper of running a "clone" restaurant. During the Top–Ten List litigation, Wamstad referred in radio advertisements as having been accused by a New York public relations person (whom he had named as a defendant) as being "diabolically clever and successful."

### Application of Public–Figure Criteria

In sum, the media coverage of Wamstad over the past 15–plus years has been substantial and considerably focused on Wamstad's personality, with Wamstad himself participating in the media discussion. Ac-

---

**8.** Fertel's lawyer asserted he got Wamstad to admit to his connection with, and payments to, the publicist who created the list. Wamstad reportedly "bristled" at that characterization of the "truth," claiming, "Twenty-three million dollars is truth."

**9.** The articles quote Wamstad's advertisement, directed at Chamberlain: "If you, your investors and the food critics want to slam III Forks, I can live with that. I probably deserve it.... However, leave Dee Lincoln and

Del Frisco's.. out of it. She's a great lady...." Chamberlain was reportedly perplexed: his advertisement had not mentioned Lincoln by name, and he had used the same advertising concept for nearly five years, which was a list that compared Chamberlain's four-star listing with the three-and-a-half stars enjoyed by *Del Frisco's* and others, with the recent inclusion of III Forks on the lower-rated list. Wamstad had not reacted to the advertisement before.

cordingly, this is not a case where a defamation plaintiff was thrust into the public eye and involuntarily remained there. Through his promotion of his family-man image in his advertising over the years, Wamstad voluntarily sought public attention, at the very least for the purpose of influencing the consuming public. The continuing press coverage over the years showed that the public was indeed interested in Wamstad's personal behavior in both the family and business context. The two were inevitably linked, particularly because reports by others contrasted significantly with the family-man persona Wamstad persistently projected in his advertising. The Article was precisely about that contradiction and thus a continuation of the public discussion of Wamstad's endeavors and disputes. Wamstad's role was both central and germane to the controversy about his contentious relationships. And when he wished to, he participated in the debate by using his media access to propound his point of view. Having invited public rebuttal concerning his persona, Wamstad took on the status of a limited public figure with respect to his behavior in business and family matters.

Wamstad argues that at most only personal disputes are involved, that there is no public controversy in the sense that the public is affected by these disputes in any real way. That is, he argues, the Article does not involve the types of controversies found in public-figure cases such as *Trotter*, 818 F.2d at 434–35 (union official assassination and labor violence in foreign country); *Brueggemeyer*, 684 F.Supp. at 455 (ongoing alleged "bait and switch" sales practices); and *McLemore*, 978 S.W.2d at 569 (why government raid failed).

■■■ We disagree that no "public" controversy existed. Wamstad himself per-

petuated the public nature of the debate over his contentious relationships through his personal self-promotion in his advertising and his other interactions with the press—with all their attendant ramifications for the opinion-forming, consuming public. We certainly agree that the public debate in this case does not involve matters of great moment in current public life. But in determining whether a "public controversy" exists, we look to whether the public actually is discussing a matter, not whether the content of the discussion is important to public life. *See Gertz*, 418 U.S. at 346, 94 S.Ct. 2997; *Waldbaum*, 627 F.2d at 1297 n. 27 ("controversy need not concern political matters").

### Actual Malice

■■■ A public-figure libel plaintiff must prove the defendant acted with actual malice in allegedly defaming him. *McLemore*, 978 S.W.2d at 573 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 283, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). The purpose of the actual-malice standard is "protecting innocent but erroneous speech on public issues, while deterring calculated falsehoods." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex. 2000). As used in the defamation context, actual malice is different from traditional common-law malice; it does not include ill will, spite or evil motive. *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex.1989). "Actual malice is a term of art, focusing on the defamation defendant's attitude toward the truth of what it reported." *McLemore*, 978 S.W.2d at 573. "Actual malice is defined as the publication of a statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* at 573–74 (quoting *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710). To establish "reckless disregard" in this context, a defamation plaintiff must prove

that the publisher " 'entertained serious doubts as to the truth of his publication.' " *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)).

The Texas Supreme Court has recently addressed the issue of what type of evidence is probative of actual malice in a case involving media defendants. *Bentley v. Bunton*, 94 S.W.3d 561, 590–96 (Tex. 2002) (reviewing finding of actual malice for sufficiency, incorporating clear and convincing standard on review). The Court summarized as follows:

> The defendant's state of mind can—indeed, must usually—be proved by circumstantial evidence. A lack of care or an injurious motive in making a statement is not alone proof of actual malice, but care and motive are factors to be considered. An understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice. A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is. Imagining that something may be true is not the same as belief.

*Id.* at 596.

### Actual Malice and Burdens of Proof on Summary Judgment

■■■■■ In a public-figure defamation case, a libel defendant is entitled to summary judgment under rule 166a(c) by negating actual malice as a matter of law. *See Casso*, 776 S.W.2d at 555. Once the defendant has produced evidence negating actual malice as a matter of law, the burden shifts to the plaintiff to present controverting proof raising a genuine issue of material fact. *Huckabee v. Time Warner Enter. Co. L.P.*, 19 S.W.3d 413, 420 (Tex. 2000). Although at trial the libel plaintiff must establish actual malice by clear and convincing evidence, at the summary judgment stage the court applies the traditional summary-judgment jurisprudence in testing whether the evidence raises a genuine issue of material fact. *Id.* at 423.

■■■■■ Affidavits from interested witnesses will negate actual malice as a matter of law only if they are "clear, positive, and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." TEX. R. CIV. P. 166a(c); *Casso*, 776 S.W.2d at 558 ("could have been readily controverted" does not simply mean movant's proof could have been easily and conveniently rebutted). In actual-malice cases, such affidavits must establish the defendant's belief in the challenged statements' truth and provide a plausible basis for this belief. *Huckabee*, 19 S.W.3d at 424. Although actual malice focuses on the defendant's state of mind, a plaintiff can prove it through objective evidence about the publication's circumstances. *Turner*, 38 S.W.3d at 120.

### Media Defendants and Actual Malice

■■■ Three employees of the *Observer*—reporter Mark Stuertz, managing editor Patrick Williams, and editor Julie Lyons—each submitted an affidavit denying actual malice. In an extensive affidavit, Stuertz stated the following, among other things: In researching for the Article, he interviewed at least nineteen people, reviewed numerous court documents (listing fifty-seven documents), court transcripts, and numerous newspaper articles concerning Wamstad (listing forty-eight newspaper articles). Most, if not all of the statements about Wamstad in the Article were corroborated, either by prior sworn court testimony or by other witnesses, and based on the similarity of assertions made by the sources, he did not doubt the credi-

bility of any of his sources, including Rumore and Roy Wamstad. He had no knowledge indicating that the Article or statements therein were false at the time the Article was published nor did he entertain any doubts as to the truthfulness of any of the matters asserted in the Article.

Julie Lyons stated the following in her affidavit: She was aware of the numerous sources for the Article, including court documents and sworn court testimony. The managing editor had stated to her that virtually all of the information, even that conveyed in interviews with Rumore and Roy Wamstad, was corroborated by other sources or documents. She had no knowledge at any time that the Article or any statements in it were false and did not at any time entertain doubts as to the truth of the statements.

Patrick Williams stated the following in his affidavit: He had editorial responsibility for Stuertz's article, and he found Stuertz a most accurate reporter. He discussed the extensive interviews, media reports, court documents and transcripts Stuertz used and the level of corroboration among the sources. He stated that "the final result was truthful, accurate, and a fair representation of the reporter's research." He had no knowledge that the Article or any statements in it were false and at no time did he entertain any doubts as to the truth of the statements in the Article.

We conclude that the affidavits contain ample evidence of a plausible basis for the *Observer's* employees to believe in the truth of the Statements as reported in the Article. Accordingly, the affidavits negate actual malice and thus shift the burden to Wamstad to produce controverting evidence that raises a genuine issue of material fact concerning actual malice.

Wamstad asserts six categories of evidence that he contends controvert the Me-

dia Defendants' denial of actual malice: (1) the Media Defendants were on notice that Rumore's credibility was questioned by the divorce judge, who questioned her allegations of Wamstad's abuse and her claim that she shot Wamstad in self-defense; (2) in recounting her tale of life with Wamstad, Rumore stated "sometimes I'm not sure what is a dream and what is real," but nonetheless, Stuertz admitted Rumore was his main source for the article; (3) the *Observer* was aware before it published the Article that Wamstad had passed a polygraph examination that contradicted Rumore's allegations of abuse; (4) Stuertz admitted he questioned the logic of Rumore's remarrying Wamstad despite her allegations of previous abuse; (5) Wamstad's media expert testified that the *Observer's* investigation was grossly inadequate; and (6) on deposition, editor Lyons testified that managing editor Williams stated the Article was "libelous as hell, but it won't be when I'm through with it," and Williams testified he had no further personal involvement with the Article after that conversation.

Wamstad's first four categories of evidence, in essence, assert that the Media Defendants were on notice that Rumore's statements were false because Wamstad disagreed with Rumore (he allegedly passed a polygraph test) and a divorce judge disagreed with Rumore's assertion that she acted in self-defense when she shot Wamstad in 1985. That the Media Defendants published her Statements anyway, his argument goes, is evidence of actual malice.

 We reject this argument, just as the court in *Huckabee* did. That Court noted the mere fact that a libel defendant knows that the libel plaintiff denies an allegation is not evidence that the defendant doubted the allegation. *Huckabee, 19*

S.W.3d at 427. Thus, that Wamstad and the divorce judge disagreed with Rumore's allegations is not evidence that the Media Defendants subjectively believed that Rumore's Statements, as they appeared in the Article, were false or that they entertained serious doubts about their truth. *Id.* In addition, a reporter may rely on statements by a single source, even though they reflect only one side of the story, without manifesting a reckless disregard for the truth. *New York Times Co. v. Connor,* 365 F.2d 567, 576 (5th Cir.1966). Furthermore, that Rumore confessed to confusion about past events, and that Stuertz thought her remarrying Wamstad was not logical, are not probative of whether Stuertz believed the Statements, as they appeared in the Article, were false.

▇▇▇ Wamstad's expert witness opined that the *Observer's* investigation was "grossly inadequate given the source bias, lack of pre-dissemination opportunity to respond, [and] lack of deadline pressure." Wamstad argues that this expert testimony—that the Media Defendants failed to investigate adequately—evinces actual malice. We disagree.

The failure to investigate has been held insufficient to establish actual malice. *Doubleday & Co., Inc. v. Rogers,* 674 S.W.2d 751, 756 (Tex.1984) (reckless conduct not measured by whether reasonably prudent person would have investigated before publishing; must show defendant entertained serious doubts as to truth of publication, citing *St. Amant,* 390 U.S. at 731, 733, 88 S.Ct. 1323); *El Paso Times, Inc. v. Trexler,* 447 S.W.2d 403, 405–06 (Tex.1969) (proof of utter failure to investigate amounted to no evidence of actual malice). Moreover, even assuming Wamstad's expert's testimony is admissible, the opinion on the Media Defendant's alleged failure to investigate speaks, rather, to an alleged disregard of a standard of objectivity. *See Brueggemeyer,* 684 F.Supp. at 466. It is not probative of the Media Defendants' conscious awareness of falsity or whether they subjectively entertained serious doubt as to the truth or falsity of the Statements as reported in the Article.

▇▇▇ Finally, Wamstad argues he raises a fact question on actual malice based on deposition testimony of Williams and Lyons. Lyons testified on deposition that Williams commented to her that the draft article was "libelous as hell, but it won't be when I'm through with it." When asked shortly thereafter about the comment, she stated she thought the statement was "partly in jest and partly reflected that he was still working on the story."

Williams testified on deposition that he spoke with Lyons, and they talked about what the *Observer's* lawyer and Williams had previously discussed. He was advised not to discuss matters subject to attorney-client privilege, and then Wamstad's attorney asked, "What was the next personal involvement you had regarding anything with Dale Wamstad or a proposed article on Dale Wamstad?" Williams responded, "Beyond that point, I can't specifically recall anything." Wamstad argues this deposition testimony controverts Williams' affidavit testimony that directly negates actual malice.

Our review of the record shows that after Williams was deposed, he testified by affidavit, stating that he went over at least two drafts of the Article with Stuertz, who answered all of his questions, and that the Article went through the standard, detailed process for editing and revision. He stated that he had no knowledge that the Article or any statements in it were false at the time the Article was published, and at no time did he entertain any doubts as to the truth of the statements made in the Article.

We conclude that Williams' not recalling his next "personal involvement" with the Article does not contradict his later affidavit testimony that the Statements in the Article were not published with actual malice. Even if Williams was not joking when he stated the draft article was libelous as written, it is irrelevant whether Williams himself or someone else edited the Article before publication; Williams unequivocally testifies in his affidavit that the Article *as published* did not contain statements he believed were false or about which he entertained doubts. *See Huckabee*, 19 S.W.3d at 428–29 (extensive legal review with editorial rewrites not evidence of actual malice).

In sum, we conclude that Wamstad has failed to raise a fact question on actual malice. Indulging all inferences in Wamstad's favor, nonetheless, the Statements in the Article were not inherently improbable or based on obviously dubious information. Neither do the actions of the Media Defendants evince a purposeful avoidance of the truth. *See Bentley*, 94 S.W.3d at 596. Accordingly, Wamstad has failed to controvert the Media Defendants' negation of actual malice.

**Individual Defendants**

 Each Individual Defendant submitted an affidavit testifying that his or her Statements were not made with actual malice, e.g., denying any subjective belief or knowledge that his or her Statements were false, and denying having any serious doubts as to their truth. We conclude the Individual Defendants' affidavits negated actual malice. *See Howell v. Hecht*, 821 S.W.2d 627, 630 (Tex.App.-Dallas 1991, writ denied) (concluding similar language negated actual malice).

 Wamstad argues that because the Individual Defendants' credibility is at issue, summary judgment is inappropriate, relying on *Casso*. This reliance is mis-

placed. In context, the import of the statement in *Casso* is that, as to actual malice, the issue of credibility does not preclude summary judgment:

> If the credibility of the affiant or deponent is likely to be a dispositive factor in the resolution of the case, then summary judgment is inappropriate. On the other hand, if the non-movant must, in all likelihood, come forth with independent evidence to prevail, then summary judgment may well be proper in the absence of such controverting proof.

*Casso*, 776 S.W.2d at 558. The *Casso* court went on to explain that the plaintiff must offer, at trial, clear and convincing affirmative proof of actual malice. *Id.* It is not enough for the jury to disbelieve the libel defendant's testimony. *Id.* Independent evidence is required:

> While it is conceivable that a defendant's trial testimony, under the rigors of cross-examination, could provide the requisite proof, it is more likely that plaintiff will have to secure that evidence elsewhere. If he cannot secure it during the discovery process, he is unlikely to stumble on to it at trial.

*Id.* at 558–59. Thus, the issue of credibility does not preclude summary judgment on the issue of actual malice.

For controverting evidence, Wamstad relies principally on his affidavit and deposition testimony denying the truth of the Statements made by, or attributed to, the Individual Defendants. In essence, he argues that falsity of the Statements is probative of actual malice.

Texas courts have held that falsity alone is not probative of actual malice. *San Antonio Exp. News v. Dracos*, 922 S.W.2d 242, 255 (Tex.App.-San Antonio 1996, no writ) (actual malice cannot be inferred from falsity of the challenged statement alone); *Fort Worth Star–Telegram v.*

*Street,* 61 S.W.3d 704, 713–14 (Tex.App.-Fort Worth 2001, pet. denied) (defendant's testimony established plausible basis for professed belief in truth of publication, thus negating actual malice even if publication not substantially correct).

Wamstad relies on *Leyendecker & Assocs. v. Wechter* for the proposition that, when the truth or falsity of a statement is within the particular purview of the defamation defendant, then falsity is probative of malice. 683 S.W.2d 369, 374–75 (Tex. 1984). *Leyendecker* is inapposite; it involved a showing of common-law malice to support exemplary damages, not a showing of constitutional "actual malice" required of a public-figure plaintiff to establish defamation. *See Casso,* 776 S.W.2d at 558 (citing *New York Times,* defining actual malice in public-figure case as term of art, different from the common-law definition of malice).

Wamstad's reliance on *Wilson v. UT Health Center* is also misplaced. 973 F.2d 1263, 1270–71 (5th Cir.1992). In *Wilson,* the Fifth Circuit Court of Appeals reversed the district court's determination that the libel plaintiff adduced "insufficient evidence of malice." We are not persuaded that *Wilson* should apply here. *Wilson* was not a public-figure case, that court applied federal procedural standards, and in a cryptic discussion it used the general term "malice," giving no indication it was applying the constitutional "actual malice" standard that we must apply here. *Id.* at 1271.

**Rumore and the Divorce Judge's Pronouncement**

■ As to Rumore, Wamstad relies on additional evidence, including evidence of a polygraph he purportedly passed, refuting Rumore's allegations of abuse. We conclude that evidence is merely cumulative of Wamstad's testimony asserting Rumore's allegations are false. As noted, falsity alone does not raise a fact question on actual malice. *Dracos,* 922 S.W.2d at 255. Wamstad also points to the divorce court's judgment granting Wamstad a separation from Rumore on the grounds of attempted murder. The divorce judge held that Rumore did not act in self-defense when shooting Wamstad, basing his decision on "discrepancies in Mrs. Wamstad's testimony, her overall lack of credibility and the Court's actual inspection of the premises. . . ."

The divorce court thus disagreed with the trial court's determination, in the previous criminal trial, that Rumore acted in self-defense. While that may well raise a fact question whether Rumore did indeed act in self-defense, it is not probative of Rumore's subjective attitude toward the truth of the Statements she made. That is, the judge's disagreement with Rumore's assertion of self-defense does not raise a fact question whether Rumore herself believed her Statement that she acted in self-defense was false. Moreover, the judge's assessment is not probative of whether Rumore believed in the truth of the other Statements she made or whether she entertained doubts as to their truth. We conclude that Wamstad's summary judgment evidence, in essence, merely asserts falsity of the Individual Defendants' Statements but does not otherwise raise specific, affirmative proof to controvert the Individual Defendants' affidavits negating actual malice.

Having negated an essential element of Wamstad's cause of action, Defendant–Appellants are entitled to summary judgment. Accordingly, we reverse the trial court's order insofar as it denies their motions for summary judgment and render judgment in favor of all Appellants.