THE HEARST CORPORATION D/B/A THE HOUSTON CHRONICLE PUBLISHING COMPANY, AND EVAN MOORE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-069-CV

THE HEARST CORPORATION APPELLANTS

D/B/A THE HOUSTON

CHRONICLE PUBLISHING 

COMPANY, AND EVAN MOORE

V.

JACK SKEEN, JR., DAVID APPELLEES

E. DOBBS, AND ALICIA CASHELL

------------

FROM THE 43
RD
 DISTRICT COURT OF PARKER COUNTY

------------

OPINION ON REHEARING

------------

After reviewing Appellants’ motion for rehearing and rehearing en banc and Appellees’ motion for rehearing, we deny the motions.  We withdraw our February 5, 2004 opinion and judgment and substitute the following. 

Appellees filed this libel cause of action seeking damages incurred from an allegedly defamatory article written by Appellant Evan Moore (Moore) and published in the 
Houston Chronicle
, a newspaper published by the other Appellant, the Hearst Corporation.  Appellants filed a motion for summary judgment seeking to dispose of Appellees’ entire case, which the trial court denied.  Appellants now bring this interlocutory appeal from the trial court’s denial of their motion for summary judgment.
(footnote: 1)
I. Statement of Facts

Appellees brought this libel action seeking damages caused by an article  in the 
Houston Chronicle
 regarding the Smith County judicial system, specifically the District Attorney’s (D.A.) office.  The article specifically names eight different criminal cases tried in Smith County involving allegations of misconduct during the period of 1970–2000.  About half of the cases discussed in the article were tried prior to current D.A. Jack Skeen’s (Skeen) tenure.

The article at issue, entitled “Justice Under Fire,” was authored by Moore and edited by Kit Frieden (Frieden).  It appeared in the 
Houston Chronicle 
on June 11, 2000, and was accompanied by several captioned photographs, subheadings, and three companion articles.  The introductory subheading states, “‘Win at all costs’ is Smith County’s rule, critics claim.”  The article begins with a discussion of the statue of the Greek goddess, the Lady of Justice, located at the entrance of the Smith County Courthouse.  The statue, as the article points out, is missing the customary blindfold that is said to illustrate that justice is blind.

The case of Kerry Max Cook, which the article states is “the most egregious, documented case of prosecutorial misconduct in the history of the state,” ignited Moore’s focused research into cases involving similar prosecutorial misconduct claims.  For more than five months, Moore researched and reviewed court documents and interviewed parties involved in the eight cases that met his “prosecutorial misconduct” criteria.  He also interviewed many defense attorneys and a judge that were not involved in these cases.

Because Moore found some cases that were overturned due to prosecutorial misconduct, the article portrays the Smith County D.A. as having a win-at-all-costs policy.  The article states that the misconduct in the D.A.’s office includes withholding exculpatory evidence, planting evidence, encouraging perjury, and selective prosecution.  Appellees Skeen, David Dobbs (Dobbs), and Alicia Cashell (Cashell), who are all specifically named in the article, claim the article is false and malicious and sought damages for libel.  

Appellants filed a motion for summary judgment.  The trial court denied the motion, finding genuine issues of material fact.  Appellants raise four issues on appeal, arguing that the trial court erred by finding there were genuine issues of material fact about whether:  (1) Appellants acted with actual malice; (2) the article taken statement by statement and as a whole was literally and substantially untrue; (3) the article was protected by constitutional, statutory, and common-law rights and privileges; and (4) the article was defamatory and was “of and concerning” Appellees.  Because the trial court did not err, we affirm the trial court’s order.  We remand to the trial court for a determination of the costs and reasonable attorney's fees of this appeal.
(footnote: 2) 

II. Legal Analysis

A. Standard of Review

Summary judgment is reviewed in public figure defamation cases under the same standard as other cases.
(footnote: 3)  In a summary judgment case, the issue on appeal is whether the movant met his summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.
(footnote: 4)  The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant.
(footnote: 5)  Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant.
(footnote: 6) 

In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence are disregarded and the evidence favorable to the nonmovant is accepted as true.
(footnote: 7)  Evidence that favors the movant's position will not be considered unless it is uncontroverted.
(footnote: 8)   Summary judgment is proper only if the record establishes that the movant has conclusively proved all essential elements of the movant's defense as a matter of law.
(footnote: 9)  If the uncontroverted evidence is from an interested witness, it does nothing more than raise a fact issue unless it is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.
(footnote: 10) 

A defendant is entitled to summary judgment if the summary judgment evidence establishes, as a matter of law, that at least one element of a plaintiff’s cause of action cannot be established.
(footnote: 11)  The defendant as movant must present summary judgment evidence that negates an element of the plaintiff’s claim.
(footnote: 12)  Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant.
(footnote: 13)
 A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense.
(footnote: 14)  To accomplish this, the defendant-movant must present summary judgment evidence that establishes each element of the affirmative defense as a matter of law.
(footnote: 15)

B. Public Figure Defamation
 

Defamation occurs when a false statement about a plaintiff is published to a third person without legal excuse, causing damages to the plaintiff’s reputation.
(footnote: 16)  Libel is defamation in written or other graphic form that tends to injure a person’s reputation, exposing the person to public hatred, contempt, or ridicule.
(footnote: 17)  To maintain a libel cause of action, the plaintiff must prove that the defendant (1) published a statement (2) that was defamatory concerning the plaintiff (3) while acting with either actual malice, if the plaintiff was a public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement.
(footnote: 18)
1. Defamatory Meaning

In their fourth issue, Appellants argue that the trial court erred by finding a genuine issue of material fact about whether the article is capable of a defamatory meaning “of and concerning” Appellees.  We disagree.

In a libel action, the court first must determine whether the statements made are reasonably capable of defamatory meaning.
(footnote: 19)  If a publication is of ambiguous or doubtful import, the jury must determine its meaning.
(footnote: 20)  An allegedly defamatory publication should be construed as a whole, in light of the surrounding circumstances, based upon how it would be perceived by a person of ordinary intelligence.
(footnote: 21)  Under Texas law, even though all the article’s individual statements considered in isolation may be literally true or non-defamatory, a publication can convey an untrue and defamatory impression by omitting or juxtaposing facts.
(footnote: 22)  Thus, whether a publication is false and defamatory depends on a reasonable person’s perception of the entirety of a publication and not merely on individual statements.
(footnote: 23)
 The article in this case begins its substantive discussion by addressing Skeen’s background, including his prior employment.  The article continues: 

He has a record for winning.  Honored as the State Bar’s Prosecutor of the Year for 1997, Skeen has been cited by a Sam Houston State University study showing that from 1980-90, Smith County led the state in meting out the longest prison sentences for major crimes and the second-longest for less violent offenses.

The question is how that record was achieved
.

During the same period that Skeen’s enviable conviction record has been growing, Smith County has gained a reputation in select circles for inequity in state criminal cases. (emphasis added.)

This portion implies that Skeen has a record of winning that was achieved by improper methods of prosecuting criminal cases, and that implication continues throughout the remainder of the article.  Therefore, this opening portion of the article raises issues of material fact about the article’s  defamatory meaning regarding Appellees.

Additionally, the article specifically names Appellees as its subjects.  Skeen is specifically named in the main article at least twenty times, Dobbs is named at least five times, and Cashell is named at least once.  A photograph of Skeen with a caption implying misconduct accompany the text.  Consistently throughout the article, Appellees are identified through pronouns such as “he,” “she,” or “they,” as well as “the State,” “the district attorney,” or “the prosecutor.”  These references also raise an issue of material fact about the article’s defamatory meaning regarding Appellees.

Likewise, Frieden’s testimony and the testimony of potential jurors also raise a genuine issue of material fact about whether the article has a defamatory meaning regarding Appellees.  Frieden testified that a reasonable reader would infer from the article that Appellees engage in unethical activities in obtaining convictions.  Potential jurors have also said the article was the reason they had a bias against the State.  One potential juror in a case in which Cashell participated recognized Cashell’s name from the article and testified that because the article cited many instances of misconduct and a win-at-all-costs policy, she felt like the State would not be honest or fair.

Consequently, because the more than two thousand pages of summary judgment evidence in this case raise multiple issues of material fact regarding the defamatory meaning of the article regarding Appellees, the trial court did not err by denying summary judgment on this issue.  We overrule Appellants’ fourth issue.

2. Actual Malice

In Appellants’ first issue, they argue that the trial court erred by finding that there was a genuine issue of material fact regarding whether Appellants acted with actual malice.  We disagree.

In this case, both sides agree that Appellees are public figures.  Thus, as an element of their cause of action, Appellees must prove that Appellants acted with actual malice.
(footnote: 24)  The purpose of the actual malice standard is to protect innocent but erroneous speech on public issues, while deterring calculated falsehoods.
(footnote: 25)  “Actual malice” for this cause of action occurs when a person makes a statement with knowledge that it is false, or with reckless disregard of whether it is true or not.
(footnote: 26)  Knowledge of falsehood is a relatively clear standard; reckless disregard is much less so.
(footnote: 27)  In this context, “reckless disregard” is a term of art requiring that the defendant in fact entertained serious doubts as to the truth of his statements at the time they were made.
(footnote: 28)  It is a subjective standard that “focuses on the conduct and state of mind of the defendant.”
(footnote: 29)  “Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.”
(footnote: 30)  Additionally, an omission can be evidence of actual malice if the plaintiff proves that the defendant knew or strongly suspected that it could create a substantially false impression.
(footnote: 31)
 To disprove actual malice, a defendant may certainly testify about his own thinking and reasons for his actions, and he may be able to negate actual malice conclusively.
(footnote: 32)  The defendant, however, cannot automatically ensure a favorable verdict by testifying that he published an article with a belief that the statements were true.
(footnote: 33)  “[H]is testimony that he believed what he said is not conclusive, irrespective of all other evidence.  The evidence must be viewed in its entirety.”
(footnote: 34)
 Although the focus is on the defendant’s state of mind, a plaintiff can prove actual malice through circumstantial evidence.
(footnote: 35)  Even though a lack of care or an injurious motive in making a statement by itself is not proof of actual malice, care and motive are factors to be considered.
(footnote: 36)  For example, a failure to investigate fully is not evidence of actual malice, but a failure to investigate motivated by a desire to avoid the truth, is purposeful avoidance.
(footnote: 37)  And an understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious can show actual malice.
(footnote: 38)
 In this case, Appellees produced sufficient circumstantial evidence to raise an issue of fact regarding Appellants’ reckless disregard.
  Although Moore spent about six months doing research for the article, he did not try to speak to Appellees until two weeks before the article’s scheduled publication.  When Moore finally did meet with Appellees, only days before the article was due, he told Skeen that he was writing an article that was “critical” of Skeen’s office. Moore spent not more than a couple of hours, collectively, with Appellees and did not discuss many of the substantive issues in the article.  This evidence of his failure to fully investigate and get Appellees’ response to the charges he made against them raises a material issue of fact about whether Moore’s behavior was “purposeful,” and, thus, whether the article was published with actual malice.

After the meeting, but before the article was published, Appellees sent a letter to Appellants addressing their concerns about the article’s bias against them, the false or incomplete information, and the credibility of Moore’s primary informants.  Appellants admitted that the letter “perturbed” them and led them to consider whether additional information should be added to the article.  Nonetheless, the text of the published article was the same as the version of the article before Appellants received the letter, except for the insertion of one three-sentence paragraph, which Frieden added.  Therefore, material facts exist as to whether Appellants recklessly disregarded the information obtained from Appellees just to meet a publication deadline that easily could have been extended.

In addition, Appellees presented evidence of a material fact issue about whether Moore knew there was not a win-at-all-costs rule or policy in the Smith County D.A.’s office.  He testified that he knew a “rule” means an action occurs more often than not, and a “policy” is more than a happenstance.  Moore admitted, however, that he was only aware of “problems” alleged in .04% or four out of every 
ten thousand 
cases, and he admitted that at the time of publication he had found mistakes in only three cases.  In fact, Moore admitted that no case tried by Skeen’s office has been reversed for a discovery violation.

Furthermore, Moore’s primary source in the article admits that he alleged discovery problems in only a small percentage of his cases.  This source admits that he is not an objective source; he always resolves doubts about facts in favor of his client.  Moore was aware of this informant’s bias and limited sample of problems and allegedly expressed doubts about the veracity of the informant or reliability of his reports.  We conclude that an issue of material fact exists about whether Moore recklessly disregarded this information and published the article anyway.

Additionally, circumstantial evidence raises material issues of fact regarding Appellants’ purposeful avoidance of the truth.  The article states that “Skeen’s office is so driven toward convictions that his 30 assistants are required to file a written report if they lose a case;” however, Moore admits that he never requested a copy of the D.A.’s written policies, and that he was aware that his informant knew there was really no policy to this effect.  The article also states that Moore’s informant Brendan Baade “apparently has filed more motions attacking the district attorney’s evidence policies than any other Tyler attorney. . . .  Most of Baade’s motions have been successful.”  However, Moore testified that he has no idea how many motions are filed attacking the D.A.’s discovery policies nor does he know how many different attorneys have filed motions.  He also does not know how many of Baade’s motions are actually successful on the basis of an evidentiary issue.  Baade also testified that he has no idea how many motions he has filed alleging discovery violations; however, he does admit that he has alleged discovery violations in only a small percentage of his cases.

Moore testified that he spoke to at least ten defense attorneys and a judge who told Moore that Skeen’s office does not have a rule, policy, or pattern of misconduct, and that only a few defense attorneys agreed with the implications the article implied.  Moore admitted that he did not seek interviews with any attorneys who might have an opposite view of the D.A.’s office than he did.  An expert testifying about the standard for adequately reporting information testified that this article fell far below that standard.  The expert testified that the article was biased and failed to impartially give an accurate and balanced account of the information presented in the article.  These facts therefore raise issues of material fact as to whether Moore purposefully avoided the truth.

Because the evidence raises issues of material fact as to whether Appellants acted with actual malice because they knew the article was false but recklessly disregarded or purposefully avoided the truth, the trial court did not err in denying summary judgment on this issue.  Appellant’s first issue is overruled.

C. Substantial Truth Doctrine

In Appellants’ second issue, they argue that the court erred in denying the motion for summary judgment because the article was substantially true.  We disagree.

Substantial truth is an affirmative defense to a defamatory claim, and the Appellees bear the burden of proof on this issue.
(footnote: 39)  A statement is substantially true, and thus not actionable, if its “gist” or “sting” is not substantially worse than the literal truth.
(footnote: 40)  Thus, liability is found if a publication gets the details right, but fails to put them in the proper context; thereby getting the story’s “gist” wrong.
(footnote: 41)  This evaluation requires us to determine whether, in the mind of the average person who read the article, the allegedly defamatory article was more damaging to the plaintiff’s reputation than a truthful article would have been.
(footnote: 42)  In determining whether an article is true or substantially true, we must look at it in light of the surrounding circumstances.
(footnote: 43)
 Under this standard, we hold that Appellants have failed to establish the substantial truth of the article as a matter of law.  Implying that there is a rule or policy of misconduct in the Smith County D.A.’s office, the article specifically discusses eight cases:  
Beddingfield
, 
Smith
, 
Mims
, 
Payne
, 
Butler
, 
Mitchell
, 
Cook
, and 
Bendy
, in which prosecutorial misconduct allegedly occurred.  Of these cases reported by Moore in support of the allegations that the Smith County D.A.’s office has a rule, policy, and pattern of misconduct, at least half of them began before Skeen took office.  Nevertheless, the article essentially merges Skeen’s tenure with his predecessors’ and falsely attributes the misconduct of his predecessors to Skeen.  Additionally, as set forth below, issues of material fact exist regarding the substantial truth of the 
Beddingfield
, 
Smith
, and 
Mims
 discussions implying selective prosecution, the 
Payne
 discussion implying general prosecutorial misconduct, the 
Butler
, 
Mitchell
, and 
Cook 
discussions implying suppression of exculpatory evidence, and the 
Bendy 
discussion
 
implying encouragement to commit perjury.

First, the article states, “[o]ur district attorney is closely allied with police officers and it’s the only county I know where, if you want to settle a case, you talk to the arresting officer first, not the DA,” and “Skeen doesn’t deny his ties to law enforcement.”  The article discusses two cases involving law enforcement officers.  The article refers to a drug sweep in the late 1970s (prior to Skeen taking office), “in which two rogue narcotics officers lied and planted evidence to make more than a hundred cases, resulted in embarrassment to the county and prison sentences for the narcotics officers.”  Thereafter, the article refers to the 
Beddingfield
 case stating: 

Recently, when Smith County Sheriff’s Lt. David Beddingfield, son of the chief deputy, was accused of drug violations, Skeen recused his office from the investigation, citing a ‘close working relationship’ with the sheriff’s office. 

Instead, a prosecutor was called in from the Texas Attorney General’s Office to work with a grand jury investigating the case.

Implying “selective prosecution,” the article continues with the following quote from a former D.A. and current defense attorney, “I don’t know how you avoid prosecuting police officers . . .  I prosecuted several when I was DA.” Omitted, however, from the article are the facts surrounding Skeen’s decision to refer the case to the Attorney General’s (A.G.) office.  At the time Beddingfield was accused, as a part of the violent crimes task force, he was a primary witness in many ongoing homicide cases.  Because of this conflict, Skeen and Dobbs contacted the division of the A.G.’s office that exists specifically to handle this type of problem.  After discussing the situation, the A.G. agreed that it was proper to refer the case to him to avoid an appearance of impropriety.  These factual omissions regarding the circumstances involved in Skeen’s decision to refer the case to the A.G.’s office present a material issue of fact regarding the substantial truth of the article.

Additionally, the 
Smith
 case is referred to in the lead article as, “A case in which a civil lawsuit became a felony theft case and a Tyler businessman was kept under perpetual, repeated indictment for four years before making his own, unsolicited appearance before a grand jury when he finally was no-billed.” The companion article explains that “Smith, however, believes he was targeted by KLTV because of a longstanding business rivalry between himself and the station; he believes he was targeted by Skeen because of a close relationship between the district attorney and KLTV,” and “[i]n all, he was indicted three times for a crime that has yet to be explained.  Finally, after Smith sued the car dealer and KLTV for false prosecution and received a $3.2 million settlement, the indictments stopped.”

The charges, however, arose when the car dealer’s attorney approached the D.A.’s office alleging that Smith was engaged in illegal activity.  The attorney received no special treatment, but was referred to the police department as was normal procedure.  The police investigation turned up enough information to send the case to the grand jury in 1989.  A note in the original file indicates that Smith was afforded the opportunity to testify at the first grand jury, but the article implies that he was only allowed to testify in the fourth grand jury presentation.  The article fails to point out that the fourth grand jury was convened at Smith’s request to provide the deposition testimony taken in 1993, and thus not available for the prior grand juries.  Although these facts were absent from the article, Moore was aware of them when he published the article.

The lead article also addressed the 
Mims
 case, stating it was “[a]n aggravated assault case in which evidence that the state’s main witness had multiple accusations of child molestation against her was suppressed until it was learned of by accident by a defense attorney.”  Although the Appellants claim that this recitation is true, it is actually only Baade’s allegations.  In deposition testimony, Moore characterized the information that he received from Baade as speculation, and he admits that he was provided no evidence to support this speculation.

Before publishing the article, Moore knew that Dobbs had informed Baade before the witness testified in 
Mims
 that one of the defendant’s relatives was accusing the witness of criminal acts, and Baade indicated that it was “not any big deal.”  In the habeas corpus hearing, the court found that Baade was informed of the accusations, and there was no formal charge against the witness at the time of the trial.  But the companion article suggests that both the presence of Skeen at the 
Mims
 trial and “the gravity of the charges” were due to the “influence” and prominence of the victim’s father.  Furthermore, the article states that “[i]n Smith County what counts is who you are, who your lawyer is and what you’ve done for the DA’s office lately.”  Issues of material fact exist regarding the substantial truth of the article because Moore admits that he does not believe this statement to be true.

Next, the article also raises issues of material fact regarding the article’s truth by implying prosecutorial misconduct in the 
Payne
 case.  The article juxtaposes that case, which was highly publicized due to a jury sentencing Payne to sixteen years for stealing a candy bar, with a comment about the verdict made by a prosecutor no longer with the D.A.’s office.  Although a mistrial was granted in that case, it had nothing to do with any prosecutorial misconduct, but was granted solely because of jury misconduct.  The article arguably states the true facts, however, the article creates a false gist that misconduct by the prosecutor was a reason for the mistrial.  

Then, the article raises issues of material fact regarding the article’s truth by implying suppression of exculpatory evidence.  The 
Butler
 case’s treatment in the article raises issues of material fact by presenting a false gist.  The case took place before Skeen’s tenure, and although Appellants argue that “[t]he article notes that the Butler case began before Skeen,” the article does not.  The only reference to Skeen with regard to the 
Butler
 case is that he joined Butler’s attorney in requesting a pardon.  A reasonable reader would infer that Skeen did something wrong and that was his reason for supporting the pardon. The true facts omitted from the article are that in a motion for DNA testing proceeding in 1999, the victim disclosed information that had never before been revealed; Dobbs disclosed that information to the defense attorney at that time.  Furthermore, Butler made no allegation that the state suppressed exculpatory evidence or engaged in prosecutorial misconduct.

The article misrepresents the facts of yet another case.  
Mitchell
 states that after Mitchell was freed because exculpatory evidence was withheld by the sheriff’s office, “last year” he sued the county and received $40,000.  The article fails to point out that the evidence was withheld from Mitchell’s trial in1981, prior to Skeen’s tenure.  Appellants contend that the article clearly indicates that this case occurred before Skeen’s tenure.  After the 
Mitchell
 references, however, the article states, “Skeen is quick to point out that all of those cases began before his first term in 1983.  Still, the blame for them has bled over, and Skeen’s office is accused of policies that may have resulted in some of the same abuses as his predecessors.”  This statement suggests that although Skeen might not have been D.A. at the time of the original problem, he was involved in the misconduct.  

The 
Cook
 case, was also originally tried before Skeen’s tenure.  Frieden concedes that a reasonable reader of the 
Cook
 discussion could interpret it as critical of Skeen.  The article refers to this case as “one of the better known examples of prosecutorial misconduct in the nation.”  The Court of Criminal Appeals, however, stated in its 
Cook
 opinion that “the acts of misconduct on the part of the Smith County District Attorney’s Office and the Tyler Police Department took place nearly twenty years ago and we do not imply any complicity in said acts on the part of the current District Attorney or current members of the Tyler Police Department.”
(footnote: 44)
 The article also suggests an inaccurate account of the timing of the DNA testing in 
Cook
.  The article implies that Skeen’s office knew the results of the DNA test prior to the plea agreement, when in fact the testing took place after the plea was entered.  The State even attempted to obtain a continuance for the testing, but was opposed by the defense.  Moore was aware of these facts but failed to include them in the article.  The article’s gist raises issues of material fact about whether it falsely implies misconduct by Skeen, and therefore, whether the article is substantially true.

Finally, the article also raises issues of material fact regarding the article’s truth by implying the D.A.’s office encourages perjury.  The main article describes the 
Bendy
 case as “[a] child molestation case in which the victim and main witness, both minors, say they were told by a prosecutor [Cashell] to ‘just say yes’ to her questions in court, despite the fact that they had attempted repeatedly to tell the prosecutor that the offense had not occurred.”  The companion article explains that a new trial was granted.  The article may mislead reasonable readers to conclude that the new trial was due to prosecutorial misconduct, and that Bendy is not guilty.  The article omits any reference to the fact that the new trial was granted solely because the court failed to shuffle jurors, not because of any alleged prosecutorial misconduct.  Moore admitted that he knew these facts, and admitted that Cashell, as well as others Moore spoke to, denied that she had told the witnesses to do anything but to tell the truth on the stand.

As a result, jurors pooled after the article was published have testified that because the article implied that the D.A.’s office acts improperly, they were biased against the State and could not be fair and impartial fact finders.  These comments raise issues of material fact that the article was more damaging to the Appellees’ reputation in the mind of an average reader than a truthful statement would have been.

Therefore, the article as a whole raises genuine issues of material fact about whether the article is substantially true because it alleges a current rule, pattern, and policy of misconduct, and it casts more suspicion on Appellees’ actions than an accurate account would have warranted.  Consequently, the trial court did not err by finding genuine issues of material fact about whether the article was substantially true.  Appellant’s second issue is overruled.

D. Privilege

In their third issue, Appellees argue that the trial court erred in finding a genuine issue of material fact about whether the article was protected by constitutional, statutory, and common-law rights and privileges.  We disagree.

1. Common-Law 

There are two classes of privileges applicable to defamation cases, “absolute” privileges and “conditional or qualified” privileges.
(footnote: 45)  Absolute privileges are thought of as immunities because they are based on the personal position or status of the actor.
(footnote: 46)  These privileges only apply in limited situations involving the “administration of the functions of the branches of government, such as statements made during legislative and judicial proceedings.”
(footnote: 47)  The judicial proceedings privilege applies to communications made in the course of a judicial proceeding including any statement made by the judges, jurors, counsel, parties, or witnesses in open court, pre-trial hearings, depositions, affidavits, and any of the pleadings or other papers in the case.
(footnote: 48)  Although libelous statements made in connection with a judicial proceeding are absolutely privileged and will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made, re-publication of such statements outside of the judicial context waives the privilege.
(footnote: 49)
 A conditional or qualified privilege arises out of the circumstances in which the allegedly false statement is published in a lawful manner for a lawful purpose.
(footnote: 50)  This privilege applies to bona fide statements made under circumstances where the author believes that the public has an important interest in a particular subject matter requiring publication, or where the author believes that a person having a common interest in a particular subject matter is entitled to know the information.
(footnote: 51)  “A conditional or qualified privilege is defeated, however, when the privilege is abused, such as when the person making the defamatory statement knows the statement is false or acts for some purpose other than protecting the privileged interest.”
(footnote: 52)  Therefore, because a conditional or qualified privilege would be defeated by a finding of malice, and malice is a necessary element of a public figure defamation cause of action, the privileges are irrelevant here.
(footnote: 53)  

In this case, we do not decide whether any of the statements in the article fall within the common law “judicial proceedings” privilege because the privilege has been waived; all of the statements made in the article were “republished.”  Additionally, because we find genuine issues of material fact regarding actual malice, Appellants did not prove that the article was protected by the common law conditional or qualified privilege as a matter of law.  Consequently, the trial court did not err in denying Appellants summary judgment regarding common law privileges.

2. Constitutional

The opinion and fair comment privileges are “constitutional privileges” that arise from limitations on the plaintiff’s cause of action imposed by the United States and Texas Constitutions.
(footnote: 54)  The privilege of opinion and fair comment grants legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact.
(footnote: 55)  The Texas Supreme Court has explained that Texas courts are bound by the U.S. Supreme Court’s holding in 
Milkovich
; therefore, we must focus our analysis on a statement’s verifiability and the entire context in which it was made.
(footnote: 56)  Furthermore, whether a publication is an actionable statement of fact or a constitutionally protected opinion depends on a reasonable person’s perception of the entire publication, not merely the individual statements.
(footnote: 57)  The First Amendment provides protection for statements that cannot reasonably be interpreted as stating actual facts about an individual, and because the parties have not argued any difference in the state and federal constitutional protections we assume the Texas constitutional protection is the same.
(footnote: 58)
 “[T]he imputation of a corrupt or dishonorable motive in connection with established facts is itself to be classified as a statement of fact and as such not to be within the defense of fair comment.”
(footnote: 59)  And while a “word may be merely epithetic in the context of amorphous criticism, it may also be used as a statement of fact that can be proved true or false.”
(footnote: 60)  As the Supreme Court explained in 
Mikovich
:

If a speaker says, “In my opinion John Jones is a liar,” he implies a knowledge of facts which lead to the conclusion that Jones told an untruth.  Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.  Simply couching such statements in terms of opinion does not dispel these implications; and the statement, “In my opinion Jones is a liar,” can cause as much damage to reputation as the statement, “Jones is a liar.”  As Judge Friendly aptly stated: “[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words ‘I think.’“  It is worthy of note that at common law, even the privilege of fair comment did not extend to “a false statement of fact, whether it was expressly stated or implied from an expression of opinion.”
(footnote: 61)

We hold that taken as a whole, this article raises issues of material fact about whether it is capable of defamatory assertions of fact.  Its overarching theme encompasses not only a harsh evaluation of Appellees’ performances but also an accusation that their allegedly dishonorable motives and actions amounted to prosecutorial misconduct.  The accusatory language in the article includes statements such as the D.A.’s office is “tainted and inequitable;” the D.A. has “a win-at-all-costs policy” consisting of “suppressing evidence,” “planted evidence,” “encouraging perjury,” and “practicing selective prosecution;” there is “a pattern of lying, cheating and violations of the law by Smith County prosecutors that wouldn’t be tolerated in Harris or Dallas County or any of the other, larger offices in the state;” “[d]ishonesty is encouraged when it helps win convictions;” and that Smith County has “more innocent people in jail than any other county in the state.”

Furthermore, to charge one falsely with the commission of any crime for which he may be punished by imprisonment is libel per se.
(footnote: 62)  The article alleges many crimes that are punishable by imprisonment, for example, coercing false testimony;
(footnote: 63) lying, cheating and violating the law;
(footnote: 64) and suppressing and planting evidence.
(footnote: 65)  Although Appellants couch their accusation of this type of criminal prosecutorial misconduct in terms of a defense attorney’s opinion, such hedging does not mitigate the defamatory impact of a criminal accusation.
(footnote: 66)
 Furthermore, as explained in 
Milkovich
, statements in the article such as: “I really thought the district attorney’s office was just as bound to seek the truth and justice as any other part of the judicial system, he said.  That’s not what they do here.  They don’t actually violate the law.  They manipulate it;”  “It’s simply a pattern of lying, cheating and violations of the law by Smith County prosecutors that wouldn’t be tolerated in Harris or Dallas County or any of the other, larger offices in the state, said Nugent.  Dishonesty is encouraged when it helps win convictions;” and “Our district attorney is closely allied with police officers and it’s the only county I know of where, if you want to settle a case, you talk to the arresting officer first, not the DA,” may not warrant constitutional protection merely because they are “opinion.”  Statements such as these, found throughout the article, are sufficient to raise genuine issues of material fact about whether the article is protected opinion.

On this basis, we conclude issues of material fact exist about whether the article includes defamatory assertions of fact that are not constitutionally protected speech; thus, the trial court did not err by denying summary judgment on this issue.

3. Statutory

Texas Civil Practice and Remedies Code section 73.002 grants a qualified privilege to media defendants that republish defamatory statements first raised in judicial proceedings, provided the statements are “fair, true, and impartial.”
(footnote: 67)  “To determine whether a media defendant’s account of a judicial proceeding is ‘fair and impartial,’ it must be interpreted in the sense that the ordinary reader would understand.”
(footnote: 68)  The media defendant must prove substantial truth to retain the privilege.
(footnote: 69)
 As explained above, Appellants did not establish the substantial truth of the accounts of the judicial proceeding in the article as a matter of law, thus, issues of material fact exist as to whether the statutory privilege applies in this case.
(footnote: 70)  Consequently, the trial court did not err in denying summary judgment on Appellants’ statutory privilege defense.  Therefore, the Appellants did not prove as a matter of law that the article was protected by common law, constitutional, or statutory privilege.  Appellant’s third issue is overruled.

III. Conclusion

Because we have overruled each of Appellants’ issues, we affirm the trial court’s judgment.  We remand to the trial court for a determination of the costs and reasonable attorney's fees of this appeal.
(footnote: 71) 

LEE ANN DAUPHINOT

JUSTICE

PANEL B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

DELIVERED: March 18, 2004

FOOTNOTES
1:
See
 Tex. Civ. Prac. & Rem. Code Ann.
 § 51.014(6) (Vernon Supp. 2004).

2:
See
 Tex. Civ. Prac. & Rem. Code Ann.
 § 51.015 (Vernon 1997).

3:
Huckabee v. Time Warner Entm’t Co.
, 19 S.W.3d 413, 423 (Tex. 2000); 
Fort Worth Star-Telegram v. Street
, 61 S.W.3d 704, 708 (Tex. App.—Fort Worth 2001, pet. denied).

4:
Tex. R. Civ. P.
 166a(c); 
S.W. Elec. Power Co. v. Grant
,
 
73 S.W.3d 211, 215 (Tex. 2002); 
City of Houston v. Clear Creek Basin Auth.
, 589 S.W.2d 671, 678 (Tex. 1979).

5:
S.W. Elec. Power Co.
,
 
73 S.W.3d at 215;
 Rhone-Poulenc
,
 Inc. v. Steel
, 997 S.W.2d 217, 223 (Tex. 1999); 
Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.
, 391 S.W.2d 41, 47 (Tex. 1965). 

6:
Great Am.
, 391 S.W.2d at 47.

7:
Rhone-Poulenc,
 997 S.W.2d at 223; 
Harwell v. State Farm Mut. Auto. Ins. Co.
, 896 S.W.2d 170, 173 (Tex. 1995).

8:
Great Am.
, 391 S.W.2d at 47.

9:
Clear Creek Basin
, 589 S.W.2d at 678.

10:
Tex. R. Civ. P.
 166a(c); 
Trico Techs. Corp. v. Montiel
, 949 S.W.2d 308, 310 (Tex. 1997).

11:
Elliott-Williams Co. v. Diaz
, 9 S.W.3d 801, 803 (Tex. 1999).

12:
Centeq Realty
,
 Inc. v. Siegler
, 899 S.W.2d 195, 197 (Tex. 1995).

13:
Id.

14:
KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.
, 988 S.W.2d 746, 748 (Tex. 1999).

15:
Ryland Group
, 
Inc. v. Hood,
 924 S.W.2d 120, 121 (Tex. 1996).

16:
Pisharodi v. Barrash
, 116 S.W.3d 858, 861 (Tex. App.—Corpus Christi 2003, no pet. h.); 
Reedy v. Webb
, 113 S.W.3d 19, 23 (Tex. App.—Tyler 2002, pet. denied); 
see also Newsom v. Brod
, 89 S.W.3d 732, 735–36 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

17:
Tex. Civ. Prac. & Rem. Code Ann
.
 § 73.001
 (Vernon 1997).

18:
WFAA-TV
,
 Inc. v. McLemore
, 978 S.W.2d 568, 571 (Tex. 1998);
 Fort Worth Star-Telegram
, 61 S.W.3d at 709;
 New Times
,
 Inc. v. Wamstad
, 106 S.W.3d 916, 921 (Tex. App.—Dallas 2003, no pet. h.).

19:
See Turner v. KTRK Television
, 
Inc.
, 38 S.W.3d 103, 114 (Tex. 2000).

20:
Id
.

21:
Id
.

22:
Id
.

23:
Id
. at 115.

24:
E.g.
, 
New Times
,
 
106 S.W.3d at 921.

25:
Turner
, 38 S.W.3d at 120; 
New Times
, 106 S.W.3d at 925.

26:
Bentley v. Bunton
, 94 S.W.3d 561, 591 (Tex. 2002);
 Turner
, 38 S.W.3d at 120;
 Carr v. Brasher
, 776 S.W.2d 567, 571 (Tex. 1989).

27:
Bentley
, 94 S.W.3d at 591.

28:
Id
.

29:
Id
.

30:
Id
. at 596.

31:
Turner
, 38 S.W.3d at 121.

32:
Bentley
, 94 S.W.3d at 596.

33:
Id
.

34:
Id
.

35:
Turner
, 38 S.W.3d at 120.

36:
Bentley
, 94 S.W.3d at 596.

37:
Id
.

38:
Id
.

39:
UTV of San Antonio
,
 Inc. v. Ardmore
,
 Inc.
, 82 S.W.3d 609, 610 (Tex. App.—San Antonio 2002, no pet.).

40:
Turner
, 38 S.W.3d at 115;
 Gustafson v. City of Austin
, 110 S.W.3d 652, 656 (Tex. App.—Austin 2003, pet. denied); 
Scripps Tex. Newspapers
,
 L.P. v. Belalcazar
, 99 S.W.3d 829, 835 (Tex. App.—Corpus Christi 2003, pet. denied); 
UTV of San Antonio
, 82 S.W.3d at 611.

41:
Turner
, 38 S.W.3d at 115.

42:
Gustafson
, 110 S.W.3d at 656; 
Scripps Tex. Newspapers
, 99 S.W.3d at 835; 
UTV of San Antonio
, 82 S.W.3d at 611.

43:
Gustafson
, 110 S.W.3d at 656.

44:
Cook v. State
, 940 S.W.2d 623, 627 n.6. (Tex. Crim. App. 1996).

45:
Hurlbut v. Gulf Atl. Life Ins.
, 749 S.W.2d 762, 768 (Tex. 1987); 
Granada Biosciences
,
 Inc. v. Forbes
,
 Inc.
, 49 S.W.3d 610, 618 (Tex. App.—Houston [14th Dist.] 2001), 
rev’d on other grounds
, 47 Tex. Sup. Ct. J. 162, 2003 WL 22999362 (Tex. Dec. 19, 2003).

46:
Hurlbut
, 749 S.W.2d at 768; 
Granada
, 49 S.W.3d at 618.

47:
Hurlbut
, 749 S.W.2d at 768; 
Granada
, 49 S.W.3d at 618–19.

48:
James v. Brown
, 637 S.W.2d 914, 916–17 (Tex. 1982);
 Dallas ISD v. Finlan
, 27 S.W.3d 220, 238 (Tex. App.—Dallas 2000), 
cert. denied
, 534 U.S. 949 (2001).

49:
James
, 637 S.W.2d at 916; 
Dallas ISD
, 27 S.W.3d at 238.

50:
Granada
, 49 S.W.3d at 619; 
see also Minyard Food Stores
,
 Inc. v. Goodman
, 50 S.W.3d 131, 139–40 (Tex. App.—Fort Worth 2001), 
rev’d in part on other grounds
, 80 S.W.3d 573 (Tex. 2002).

51:
See Granada
, 49 S.W.3d at 619; 
Minyard Food Stores
, 50 S.W.3d at 139–40.

52:
Granada
, 49 S.W.3d at 619.

53:
Id
.

54:
Bentley
, 94 S.W.3d at 578–79.

55:
Milkovich v. Lorain Journal Co
., 497 U.S. 1, 13, 110 S. Ct. 2695, 2702-03 (1990); 
Bentley
, 94 S.W.3d at 579.

56:
Bentley
, 94 S.W.3d at 581; 
Pisharodi
, 116 S.W.3d at 862.

57:
Bentley
, 94 S.W.3d at 579.

58:
Id
. at 579–80; 
see also Granada
, 49 S.W.3d at 619.

59:
Bentley
, 94 S.W.3d at 583.

60:
Id
. at 581–82.

61:
Milkovich
, 497 U.S. at 18–19, 110 S. Ct. at 2705–06; 
Bentley
, 94 S.W.3d at 583–84 (citations omitted).

62:
Christy v. Stauffer Publ’n
 ,
 Inc.
, 437 S.W.2d 814, 815 (Tex. 1969); 
see also Chang v. Linh Nguyen
, 81 S.W.3d 314, 316 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

63:
See
 Tex. Penal Code Ann.
 § 36.05 (Vernon 2003) (tampering with witness).

64:
See
 
id
. § 39.02(a)(1) (abuse of official capacity).

65:
See
 
id
.
 § 37.09 (tampering with or fabricating physical evidence).

66:
See Bentley
, 94 S.W.3d at 583–84.

67:
Tex. Civ. Prac. & Rem. Code Ann.
 § 73.002; 
Tex. Monthly
, 
Inc. v. Transamerican Natural Gas Corp.
, 7 S.W.3d 801, 805 (Tex. App.—Houston [1st Dist.] 1999, no pet.).

68:
Tex. Monthly
, 7 S.W.3d at 805; 
see also Scripps Tex. Newspapers
, 99 S.W.3d at 836; 
Entravision Communications Corp
.
 v. Belalcazar
, 99 S.W.3d 393, 398–99 (Tex. App.—Corpus Christi 2003, pet. denied).

69:
See Swate v. Schiffers
, 975 S.W.2d 70, 75 (Tex. App.—San Antonio 1998, pet. denied); 
see also Tex
.
 Monthly
, 7 S.W.3d at 805.

70:
See Scripps Tex. Newspapers
, 99 S.W.3d at 837; 
Entravision Communications Corp
., 99 S.W.3d at 399.

71:
See
 Tex. Civ. Prac. & Rem. Code Ann.
 § 51.015 (Vernon 1997).