

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-12-00193-CV
_____

BRANDON DARBY, APPELLANT

V.

THE NEW YORK TIMES COMPANY AND JAMES C. MCKINLEY, JR., APPELLEES

On Appeal from the 274th District Court
Hays County, Texas
Trial Court No. 11-0528, Honorable Gary L. Steel, Presiding

February 26, 2014

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

This appeal involves a claim of defamation. According to Brandon Darby, the New York Times and its writer, James C. McKinley, Jr., besmirched his reputation by uttering a falsehood in an article. McKinley's article delved into the burning of the Texas Governor's mansion, the people allegedly behind that bit of arson, self-styled political activists or anarchists, and the 2008 Republican National Convention in Minnesota. Among the article's many paragraphs appeared one stating that:

. . . federal agents accused two men from these circles of plotting to make firebombs and hurl them at police cars during the convention. An F.B.I. informant from Austin, Brandon Darby, was traveling with the group and told the authorities of the plot, which he had encouraged.

Darby does not dispute his status as a purported activist-turned-paid government informant. Nor does he deny participating in the adventure to the Republican Convention with a small group from Texas, which group included the "two men" alluded to in the writing. That the group members went there to engage in protests and that Darby's purpose for joining them included the gathering of information about their activities for the FBI is similarly undisputed. What he does question, however, is the accuracy of the statement indicating that "he had encouraged" the "plot" to "make firebombs and hurl them at police cars."

The "two men" alluded to in the article, David McKay and Bradley Crowder, actually made Molotov cocktails. Darby knew that. McKay and Crowder planned to throw the incendiary devices as part of their protest. Darby knew that as well. But, the two had a change of heart. That change did not prevent McKay and Crowder from being arrested, prosecuted, convicted, and jailed.

Because he believed he was wrongfully accused of encouraging the plot, Darby sued the newspaper and McKinley for defamation.[1] The latter moved for summary judgment, which motion was granted them. We now address the propriety of that judgment and, upon doing so, affirm it.

---

[1] We refer to the New York Times and McKinley as McKinley for purposes of this opinion.

*Applicable Law*

The standard of review applicable to summary judgments is settled. Rather than reiterate its general tenets, we cite the litigants to *Neely v. Wilson*, No. 11-0228, 2013 Tex. LEXIS 1082, at *10-11 (Tex. June 28, 2013). Whether the movant seeks a traditional or no evidence summary judgment may affect the respective burdens of the parties. However, when each party presents evidence supporting their position, the issue is not so much whether a party fulfilled its burden but whether a material question of fact exists. *Id.* at *11. In deciding this, we construe the evidence in a light most favorable to the non-movant; so too are reasonable inferences from that evidence drawn in favor of the non-movant. *Id.*

Because the trial court's judgment at bar did not specify a particular ground upon which it acted, Darby has the burden to illustrate why none of those grounds support the trial court's decision. *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995). In other words, we must affirm the decree if any one of the grounds asserted is meritorious. *Western Investments, Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

*Application of the Standard*

McKinley proffered seven grounds purportedly warranting summary judgment in his favor. We address those necessary to the disposition of the appeal.

3

*Whether the Statement is Libelous Per Se*

McKinley and his employer initially contended that the statement in question was not libelous *per se* because it failed to accuse Darby of a crime or injure him in his office, profession, or occupation. We disagree.

The category of statements deemed per se defamatory include those 1) accusing one of untruthfulness, dishonesty or fraud, 2) that impute to the complainant the commission of a crime, indicate he contracted a loathsome disease, or indicate that he engaged in sexual misconduct, and 3) causing injury to a person's office, business, or profession. *Medical Gardens, LLC v. Wikle*, No. 07-12-00111-CV, 2013 Tex. App. LEXIS 6699, at *3-4 (Tex. App.—Amarillo May 29, 2013, no pet.) (mem. op.) Whether the comment at issue falls within one of these categories is a question of law. *Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013); *Medical Gardens, LLC v. Wikle,* 2013 Tex. App. LEXIS 6699, at *3-4. And, being a question of law, we consider it *de novo*. *Stockton v. Offenbach*, 336 S.W.3d 610, 615 (Tex. 2011) (stating that an appellate court reviews questions of law *de novo*).

McKinley did not suggest via his motion that manufacturing and possessing Molotov cocktails with the intent to throw them at police officers is not a crime. So, we need not consider that. *See* TEX. R. CIV. P. 166a(c) (stating that issues "not expressly presented to the trial court by written motion . . . shall not be considered on appeal as grounds for reversal"). Instead, he and his employer initially proposed that accusing one of encouraging another's engagement in criminal conduct is not a crime. Section 7.02(a)(2) of the Texas Penal Code illustrates otherwise. It provides that one is criminally responsible for an offense committed by another where the former "acting

4

with intent to promote or assist the commission of the offense . . . solicits, **encourages**, directs, aids, or attempts to aid the other person to commit the offense." Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ Aɴɴ. § 7.02(a)(2) (West 2011) (Emphasis added). So encouraging others to make and throw Molotov cocktails at police officers may indeed be a crime itself.

The movants also asserted that no crime was involved because Darby was acting as an informant for the FBI and he enjoyed immunity from prosecution as an informant or lacked the *mens rea* to be a co-conspirator. Interestingly omitted from this argument, though, is citation to authority holding that one must be subject to actual prosecution before a false assertion about engaging in criminal activity can be considered defamatory *per se*. Also missing is citation to authority holding that immunity somehow washes away the criminal character of criminal acts or somehow cleanses a dirty *mens rea* of its taint. This omission may arise from the fact that immunity simply insulates one from prosecution or lawsuit; it does not cleanse the act of its character. *See Leach v. Texas Tech University*, 335 S.W.3d 386, 392 (Tex. App.—Amarillo 2011, pet. denied) (wherein the court explained that while immunity bars a lawsuit for breach of contract the contract parties remain responsible for their breach).

Nor can one reasonably extrapolate from the authority cited by McKinley, *e.g., Boyer v. State*, 801 S.W.2d 897 (Tex. Crim. App. 1991), the premise that an informant's action cannot be classified as criminal. Admittedly, the *Boyer* court held that when an informant serves as an intermediary and acts as an agent for a law enforcement officer in carrying out his official duties, the intermediary cannot be held criminally responsible for his conduct. *Id.* at 899. Yet, the court did not say that the

intermediary's conduct was not a crime.  Indeed, if the status of being an intermediary or informant somehow meant his act was not criminal, then the *Boyer* court had no reason to decide whether the informant could be held criminally responsible for it; after all, it matters not whether one may be criminally prosecuted for acts that are not crimes.

Furthermore, the very same court has since held, and quite repeatedly, that this freedom from criminal responsibility exists as long as "their actions do not rise to a level of illegal conduct."  *Reese v. State*, 877 S.W.2d 328, 336 (Tex. Crim. App. 1994) (and cases cited therein).  That is, "state agents [used] in ferreting out crime are not themselves parties to the crime as long as they do not bring about the crime."  *Id.*; *see also Burns v. State,* 473 S.W.2d 19, 20 (Tex. Crim. App. 1971).  So, as can be seen, an informant may well be convicted of crimes arising from his performance as an informant.

As for the argument involving the *mens rea* of an informant, it may well be that an informant can escape prosecution as a co-conspirator because he lacks the "intent to further the objective" as suggested by McKinley.  Yet, lacking *mens rea* for purposes of being a co-conspirator is not the same as saying that being an informant means, as a matter of law, he commits no crime.  *Reese*, *Burns* and their progeny illustrate otherwise.

In view of the foregoing, we cannot say that Darby's status as an informant entitled McKinley to summary judgment as a matter of law.  We know of no authority saying that one cannot defame an informant simply because the informant, in certain

6

situations, may not be subject to criminal prosecution, and we do not wish to create such authority now.

*Constitutionally Protected Nature of the Statement*

McKinley next sought summary judgment on the ground that the statement was constitutionally protected due to its status as an unverifiable fact. In other words, the word "encourage" or "encouraged" is too vague and actually expresses nothing more than one's opinion, according to McKinley. The argument did not entitle him to summary judgment as a matter of law.

Opinions may be actionable if they imply false statements of objective fact. *Simmons v. Ware*, 920 S.W.3d 438, 449 (Tex. App.—Amarillo 1996, no writ). Furthermore, "the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Bentley v. Bunton*, 94 S.W.3d 561, 571 (Tex. 2002), *quoting Turner v. KTRK TV, Inc.*, 38 S.W.3d 103 (Tex. 2000). The same is no less true when determining if the utterance is an actionable statement of fact or a constitutionally protected expression of opinion. *Id.* All depends on a reasonable person's perception of the entirety of a publication and its verifiability. *Id*. at 582.

The article wherein the statement at issue appeared concerned the arson of the Texas Governor's mansion. It spoke of the Texas Rangers "finally closing in on the person responsible" and the link between that person and a group of local anarchists. Reference was then made to purported members of that local group who pled guilty to "making and possessing gasoline bombs during the 2008 Republican Convention . . . ."

The author then returned to describing the investigation into the arson of the Governor's mansion and how the investigators engaged in "old-fashioned police work," such as watching video footage, "penetrat[ing] counter culture hangouts" whereat "fashion accessories tend toward piercings and tattoos" and "globalization is a dirty word," and offering cash in exchange for "leads." At that point, effort was taken to describe how the viewpoints of some local anarchists had changed. Some no longer attacked all forms of government, the author wrote, but instead engaged in social causes such as food distribution, recycling, and the like.

Discussion of the two individuals who "plead guilty to making and possessing gasoline bombs during the . . . Convention" then became the focal point of the article once again. McKinley alluded to them "plotting to make firebombs" and throw the bombs at the police cars. He then named the individuals (that is, Crowder and McKay), revealed their respective prison sentences, alluded to Darby as being an F.B.I. informant who travelled with them, and followed that by stating that Darby "told authorities of the plot" that he "encouraged."

Mention was also made of Crowder denying involvement in the "mansion fire" and ridiculing the idea that a local anarchist group was "behind both crimes." McKinley closed his story by quoting an Austin anarchist who knew Crowder and McKay and also belittled the notion that a cohesive Austin anarchist group was involved in the incident at the Republican Convention.

From the context described above, "a reasonable person's perception of the entirety of a publication" would be that McKinley was discussing crime, its commission in both Austin and Minnesota, and the identity of those responsible for its commission.

And, in disclosing the identity of two individuals known to have committed the Minnesota crime, McKinley described Darby as encouraging their criminal "plot." A reasonable person reading the allusion to Darby in the context of the article as a whole could rationally perceive it as attributing criminal conduct to Darby. This is especially so given the aforementioned statute expressing that one who "encourages" another to commit a crime is also guilty of that crime.

In short, McKinley was not speaking of unverifiable fact or proffering vague rhetoric. Rather, he was speaking of particular crimes and the identity of those to whom the crimes could be attributed. The scope of his attribution included Darby, and the identity of those engaged in specific crimes is verifiable fact, as illustrated by the numerous convictions emanating from our criminal courts.

*True or Substantially True*

McKinley also sought summary judgment on the ground that the statement was true or substantially true. Upon reviewing the record, we find the presence of a material issue of fact on the matter.

That the utterance is true or substantially true is a defense to a defamation claim. *Neely v. Wilson*, 2013 Tex. LEXIS 1082, at *17-18. Specific statements that err in the details but correctly convey the gist of a story are substantially true. *Id.* at *22. However, a statement "'can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory.'" *Id.* at 22-23, *quoting Turner v. KTRK TV, Inc.*, 38 S.W.3d 103 (Tex. 2000). And, as we do when determining whether speech is mere opinion or verifiable fact, we focus on the gist of the broadcast or

9

writing as viewed through the eyes of a person of ordinary intelligence when assessing its truth or substantial truth. *Id.* at 23.

Again, McKinley wrote of arson and those committing it. In asserting that Darby "encouraged" the plot to make "firebombs" and "hurl them" at police cars, he charged Darby with helping Crowder and McKay further the particular bit of arson and assault they planned, or so a reasonable person could interpret the statement's gist. As for evidence illustrating the statement's accuracy, some does appear of record. For example, one acquaintance of Darby disclosed how Darby described himself as a "militant revolutionary," sought to burn down a bookstore in Austin, provoked and encouraged others to do violent acts in the past, and often talked about taking violent action encompassing arson and the use of guns. Another acquaintance who worked with Darby in New Orleans remembered driving with Darby when Darby suggested that "we use Molotov cocktails to bomb an insurance company" and for help in recruiting people to do the bombing. Furthermore, Darby told McKay and Crowder, when discussing the RNC, that 1) he "was going to shut that fucker down," 2) any group he went with was "going to be successful in their efforts," 3) he views "process as something that is developed through working together . . .," 4) they all needed to have their "voices heard," 5) each needed a say to assure that none "of us were doing something we weren't comfortable with," 6) he "wasn't there to fuck around," 7) "direction action is intense and that we could all expect to have violence used against us," 8) "we could all expect to be intimidated in jail and that the cops would probably put us into cells with people who would try to ass rape us or hurt us," 9) he was "ready to deal with the potential for violence and that if . . . [they] were not then they shouldn't

work with [him]," and 10) McKay and Crowder looked like they ate "tofu" and needed to eat "beef" so they "could put on muscle mass" and they "weren't going to be able to fight anybody until . . . [they] did so." Darby also said such things as they had to carry arms to support what they believed and asked McKay if he was that type of person and whether he was willing to burn people for his beliefs. Other evidence attributes to Darby such comments as how he thought he could "reach" Crowder and McKay, how he acted as their mentor, how he sought permission from the FBI to violate certain laws, and how he spoke with McKay and Crowder about training techniques and techniques they could use while in a protest. So too is there evidence of Darby admitting to knowing that McKay bought items to make Molotov cocktails and had a meeting with him to see with his own eyes whether McKay had manufactured explosive devices.

Upon reading the transcript of McKay's plea hearing before a federal judge, one would also encounter evidence about Darby providing him money to acquire the components for the Molotov cocktails and discussing the number of bombs involved and their deployment. And, though Crowder (at his own federal plea hearing) denied that Darby had any direct involvement with the decision to make incendiary devices, Crowder nevertheless told the judge of a story Darby imparted. It concerned an Italian man who made and threw his own Molotov cocktails. The story concluded with Darby saying that "if you want to do this, [that] is how it's done."

To this, we add evidence of McKay growing hesitant once the incendiary devices were built. Apparently Darby became aware of this and texted him such things as 1) "'You be trippin'. All jimmy hendrix style and shit,'" 2) "'It's your call. I support you

11

making whatever choice you are comfortable with. Be proud of yourself for your work and take a chill,'" and 3) "'Its all good bro. I respect the work youve [sic] done here. Youre [sic] going to get up and feel bad. I've done that many, many times. Sometimes its best to fight another day. I respect and care for you . . . . '"

On the other hand, the record also contains evidence absolving Darby of any supposed encouragement and placing into question whether McKinley's utterance was accurate. For instance, Darby denied encouraging the plot. He also said he attempted to dissuade McKay and Crowder from pursuing it and considered the two "some strange form of collateral damage" in his effort to gain access to plans involving the RNC protests and as he played his role as informant. And, it is this mix of evidence which prevents us from concluding that the trial court could have legitimately awarded McKinley and his employer summary judgment on the basis that the comment was true or substantially true. The record before us presents a material issue of fact on the matter necessitating resolution outside the summary process of Texas Rule of Civil Procedure 166a. *See Halsell v. Dehoyos,* 810 S.W.2d 371, 372 (Tex. 1991) (holding that material issues of fact must be resolved by a jury).

*Actual Malice*

McKinley also argued that Darby was a public figure, which Darby conceded. Consequently, the latter had to prove that the statement at issue was made with actual malice to entitle him to recover. According to McKinley, however, the record disproved the existence of such malice, as a matter of law. We agree.

It has long been true that one cannot be held liable for false statements uttered about a public figure unless the falsehoods were made with actual malice. *New York*

*Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[2] Furthermore, the burden to prove such malice lies with the complainant; it is his obligation to satisfy that burden via clear and convincing evidence. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 116 (Tex. 2000). Because the issue was raised via a motion for summary judgment, the movants (McKinley and the New York Times) had the obligation to present evidence disproving malice, as a matter of law.

Next, actual malice is a term of easy definition but difficult application. It denotes a statement uttered with actual knowledge of its falsity or with reckless disregard as to its truth or falsity. *Hearst Corp. v. Skeen,* 159 S.W.3d 633, 637 (Tex. 2005); *Bentley v. Bunton*, 94 S.W.3d at 591. One acts recklessly when his statements are ". . . made with a high degree of awareness of probable falsity" or when the ". . . defamer entertained serious doubts that his declaration was true." *Doubleday & Co. v. Rogers*, 674 S.W.2d 751, 756 (Tex. 1984). Thus, the standard or test is a subjective one. *Hearst Corp. v. Skeen*, 159 S.W.3d at 637. And, the focus lies upon what the writer knew or thought at the time the article was written or published. *Id.* And, therein lies the reason for its difficulty in application.

Experience shows that seldom do those to whom improper conduct is attributed admit to engaging in such conduct. Nor do they tend to admit to having the type of *mens rea* needed to inculpate the individual. So too may one have the propensity to view an accused's utterances about his innocence with a dubious eye. That may be why summary judgment procedure authorizes entry of judgment based upon testimonial evidence of an interested party only if that evidence is uncontested, clear,

---

[2] We treat the issue of whether the purportedly defamed individual is a public figure as a question of law. *Neely v. Wilson*, No. 11- 228, 2013 Tex. App. LEXIS 511, at *13 (Tex. June 28, 2013).

positive, direct, credible, free from inconsistency, and of the type that could be readily controverted. Tex. R. Civ. P. 166a(c). Yet, if the testimony is of that ilk, it may indeed provide the basis for summary judgment. And, most importantly, the accused in a defamation proceeding is free to testify about his thoughts at the time and reasons for saying what he did. *Bentley v. Bunton*, 94 S.W.3d at 596. If his affidavit illustrates his belief in the statement's truth and provides a plausible basis for that belief it may well be sufficient to negate actual malice as a matter of law. *Huckabee v. Times Warner Entertainment Co., L.P.,* 19 S.W.3d 413, 424 (Tex. 2000).

Again, McKinley's statement underlying this libel suit was:

federal agents accused two men [Crowder and McKay] . . . of plotting to make firebombs and hurl them at police cars during the convention. An F.B.I. informant from Austin, Brandon Darby, was traveling with the group and told the authorities of the plot, *which he had encouraged*.

(Emphasis added). According to the writer, as disclosed in his affidavit, he had not previously written any articles on Brandon Darby, Bradley Crowder, or David McKay. While researching his story, the writer contacted Stephen McCraw, Director of the Texas Department of Public Safety, Tom Vineger, spokesperson for the Texas Department of Public Safety, Jeffrey DeGree (McKay's attorney), Bradley Crowder, and Scott Crow who was an Austin activist who knew McKay, Crowder, and Darby. Effort was made to also contact Darby, but it proved unfruitful. Toby Lyles, of the research desk at the New York Times, also provided him with background research.

According to McKinley, his statement about Darby encouraging the plot was based upon "then-recent conversations with Jeffrey DeGree and Scott Crow." They

"discussed Brandon Darby's involvement with David McKay and Bradley Crowder leading up to and during the 2008 RNC and Brandon Darby's role as an undercover informant." DeGree purportedly "told . . . [him] that . . . Darby had encouraged . . . McKay and . . . Crowder's behavior and that was the basis for the statement at issue." Scott Crow also told him that Darby encouraged McKay and Crowder "to take actions beyond peaceful demonstrations during the protest at the 2008 RNC." McKinley further attested that he 1) believed the utterance to be true at the time of its publication, 2) had no feelings of hatred, ill will, or spite toward Darby, and 3) had never heard of Darby prior to writing the article.

Charles Strum, the Deputy National Editor for the New York Times, also executed an affidavit wherein he stated that 1) he believed the statement about Darby's encouragement to be true at the time of publication, 2) he still believed it to be true, 3) at no time prior to filing a lawsuit did Darby contact the New York Times to request a retraction or correction or to assert that the article contained an inaccurate statement, 4) he had no feelings of hatred, ill will, or spite toward Darby and nothing he learned while editing the story caused him to have any negative feeling toward Darby, and 5) he did not entertain any serious doubts about the statement in question and if he had reason to believe it was untrue, he would not have allowed it to be published without further verification.

A third affidavit was also appended to the motion for summary judgment. It was that of Scott Crow. In it, Crow mentioned that McKinley interviewed him and that he (Crow) believed that Darby had encouraged Crowder and McKay. His belief, the affiant continued, was based upon his past activist experiences with Darby.

15

As previously mentioned, DeGree represented McKay in the criminal prosecutions related to his action at the Republican Convention. During the first of the two criminal proceedings,[3] McKay contended that Darby had entrapped him into planning the Molotov cocktail assault. The allegation was recanted before the second trial began, however. At that point, McKay admitted that Darby had not "induced" him to act and admitted to having a predisposition to engage in the conduct at issue. Nevertheless, Darby's involvement in the plan remained an aspect of his defense. McKay described the extent of Darby's involvement at a plea hearing held before the commencement of the second trial. He told the trial court that 1) the three individuals (*i.e.*, McKay, Crowder, and Darby) engaged in a conversation around a "computer," 2) the conversation "involve[ed] Molotov cocktails," 3) though Darby did not broach the subject, Darby's "suggestions were about the tactics we were going to use with them, about having enough to hand out, [and about] a . . . specified meeting point in the park." And, in response to questioning by DeGree about whether Darby gave him "20 to 30 dollars to make—to buy the materials to get the Molotov cocktails," McKay also answered, "Brandon gave me money to contribute, yes."

Relying on a single source of information which source reflects only one side of the story is not actual malice. *New Times, Inc. v. Wamstad,* 106 S.W.3d 916, 928 (Tex. App.—Dallas 2003, pet. denied). Here, McKinley had several sources saying the same thing. And, while he did not attest to reading the transcription of McKay's plea hearing before writing his article, the transcript nonetheless contained information supporting DeGree's representation that Darby had encouraged the activity. Knowing that DeGree represented McKay at the proceeding, McKinley had basis to believe that

---

[3] The initial trial resulted in a hung jury.

DeGree knew of what he said. In other words, McKinley understood that DeGree was privy to relevant information underlying his observation about Darby encouraging the plot. And, aside from Darby's factually unsubstantiated insinuation within his appellate brief that an attorney representing a criminal defendant cannot be believed when proclaiming the innocence of his client, we have been cited to no evidence of record suggesting that McKinley should have disbelieved DeGree. Couple that with Crow's own disclosure about his activist experiences with Darby and Crow's belief that Darby encouraged McKay and Crowder, McKinley had at least two viable sources upon which to make the utterance. As stated, a reporter may rely on statements by a single source. *See New Times, Inc. v. Wamstad,* 106 S.W.3d at 928 (stating that a reporter may rely on statements by a single source even though they reflect only one side of the story without showing a reckless disregard for the truth).

Again, affidavits are sufficient to support a summary judgment in their favor if they state the affiants' belief in the truth of those statements and describe the sources underlying that belief. *Nelson v. Pagan,* 377 S.W.3d 824, 834 (Tex. App.—Dallas 2012, no pet.) (finding affidavits of editors sufficient which stated that the subject postings were based on discussions with a particular reporter, documents provided by the reporter, and a review of related articles and that they believed the statements to be true); *see also Freedom Newspapers v. Cantu,* 168 S.W.3d 847, 853 (Tex. 2005) (holding that affidavits from a publisher and copy editor averring that neither had knowledge of inaccuracies or any reason to doubt the accuracy of the articles was some evidence that the newspaper acted without malice and shifted the burden to the defendant to produce contrary evidence). The affidavits of McKinley and Strum do just

17

that.  They illustrate that neither the writer nor his employer's representative knew the utterance about Darby encouraging the plot was false.[4]  They illustrate that neither harbored serious doubt about the accuracy of the utterance at the time it was made.  They also illustrate the foundation underlying McKinley's utterance about Darby encouraging the plot.[5]  So too were the affidavits clear, positive, direct, and free from inconsistency.  And, most importantly, they were of a type that could be readily controverted.  That is, Darby could have deposed McKinley and Strum to test their representations, but he did not.  So too could he have questioned or deposed DeGree, Crow, or any of the other individuals alluded to in the documents to determine what they may have told McKinley and whether McKinley prevaricated in the least bit, but he did not.

Instead, Darby counters by referring to emails sent to McKinley by other reporters after the article was published.  That the comments were made after the fact render them inconsequential to the issue before us.  We reiterate that actual malice is determined by what the writer knew or thought at the time of the writing or publication, not what was discovered thereafter.[6]  *Hearst Corp. v. Skeen*, 159 S.W.3d at 637.  And,

---

[4] We need not delve into the rather interesting proposition about whether a purported defamer can know a statement is false when evidence exists allowing a rational jury to find the statement true or harbor serious doubt about its truthfulness given like evidence.

[5] That McKinley's affidavit mentioned his belief about the accuracy of what he said, who he spoke with prior to making the statement, and that two of those sources said Darby encouraged the conduct negates Darby's assertion that the document was conclusory.  Though more could have been included, it provided factual data underlying his conclusion about why he thought as he did.  *See Thompson v. Curtis*, 127 S.W.3d 446, 450 (Tex. App.—Dallas 2004, no pet.) (holding a conclusory affidavit is one that fails to allege facts that support the conclusion).

[6] In one email, the reporter states that he spent six months covering the story about Crowder and McKay, spoke with Crowder who allegedly told him that Darby learned of the Molotov cocktails "'after the fact,'" and wondered why McKinley would state that Darby encouraged the plot "'without attributing it to someone.'"  What was meant by "after the fact" went unexplained.  Again, Darby himself admitted to knowing of the cocktails before effort was made to deploy them.  So too did his own texts

18

that other reporters may have disagreed with McKinley's proposition is not evidence illustrating a subjective awareness of or presence of serious doubt regarding the accuracy of the statement. *See New Times, Inc. v. Wamstad*, 106 S.W.3d at 927-28 (stating that because the plaintiff and a judge disagreed with a source's characterization of a statement is not evidence that the media defendant reiterating the statement acted with actual malice).

Another effort missing the mark is Darby's assertion that a "complete picture of the newspaper's internal research process is essential because the information that . . . would have [been] found with even a cursory search would raise serious doubts about the truth of this article." He fails to cite us to anything of record suggesting what such a search would have uncovered; nor may we guess at that. Additionally, our Supreme Court has held the "[f]ailure to investigate the truth or falsity of a statement before it is published" is no evidence of actual malice. *Dun & Bradstreet, Inc. v. O'Neil,* 456 S.W.2d 896, 901 (Tex. 1970), *quoting El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403

---

reveal that he supported McKay in "whatever" course of action he opted to pursue; one such course could have been the use of the bombs. This alone could lead one to question the accuracy of what the reporter was insinuating in his email. We further note that after the reporter commented about the lack of attribution, New York Times published a corrected version of the story. Therein, the newspaper wrote that while both Crowder and McKay pled guilty, one of the two "implicated Mr. Darby, saying Mr. Darby had persuaded him to make the bombs. He later conceded that Mr. Darby had not entrapped him." The latter comports with McKay's testimony at the federal plea hearing.

As for the second email sent by a different reporter, it states that McKay "'admitted he lied'" about Darby once he realized "'Crowder was going to testify against him.'" That was followed by the statement that "'[i]t has never been proven that Darby was anything more than an informant along for the ride.'" Yet, the testimony captured within the transcript of McKay's plea hearing reveals that McKay never recanted his accusation about Darby encouraging his plan. Rather, he simply retracted his allegations about being entrapped. And, as will be discussed *infra*, they are two different matters. As for the reference to Darby never having been proven to be complicit in the activity, we again refer to Darby's texts to McKay and his admission about knowing of the bombs and contacting McKay about them. Yes, Darby may well have just been an informant as suggested by the reporter. But evidence of Darby's complicity as more than an informant appears of record, as previously described. And, that evidence tends to erode the premise offered by Darby that had McKinley read the emails he would have somehow been required to believe his statement was false.

(Tex. 1969); *see also Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 497-98 (Tex. App.—Dallas 2003, no pet.) (holding the same). Nor is the "failure of defendant to perform verification required by its own standards" such evidence. *Doubleday & Co. v. Rogers*, 674 S.W.2d at 756. It may evince negligence or activity below that expected of a reasonable person, but not actual malice. *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d at 901.

Nor can we ignore Darby's attempt to paint McKinley with the brush of malice by attempting to confuse the distinction between the words "encourage" and "entrap". McKinley knowing McKay recanted the entrapment allegation (assuming McKinley knew that in the first place) is no evidence of a subjective belief about the accuracy of the statement that Darby encouraged the misconduct. To conclude otherwise would be to say that an apple must be as sour or bitter as a quince because both look the same and grow on trees. Because two things have similarities does not mean they are the same. Entrapment is a legal theory providing a defense to one being criminally prosecuted. It consists of two elements, the first being the accused's lack of predisposition to commit the offense and the second being the government's inducing the accused to engage in the crime. *United States v. Nelson*, 732 F.3d 504, 513-14 (5th Cir. 2013); *accord Thomas v. State*, No. 07-12-00446-CR, 2013 Tex. App. LEXIS 13614, at *3 (Tex. App.—Amarillo November 4, 2013, no pet. h.) (stating that entrapment is a defense requiring proof that "the 1) accused engaged in the conduct charged, 2) he was induced to do so by a law enforcement agent, and 3) the agent used persuasion or other means likely to cause persons to commit the offense"). As stated by the court in *Nelson,* the ultimate question revolves around "'whether criminal

intent ***originated*** with the defendant or with government agents.'" *United States v. Nelson*, 732 F.3d at 514, *quoting United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997) (Emphasis added). As such, the focus lies upon what was said and done when the relationship between the government and its eventual dupe began. If the accused was predisposed or had already decided to engage in the activity before government intervention, then he was not entrapped. And, McKay ultimately conceded those to be the circumstances involved; Darby did not entrap him.

On the other hand, "encourage" connotes "to inspire with courage, spirit, or hope," "to hearten," "to attempt to persuade," and "to give help". MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 410 (11th ed. 2003); *see e.g.*, *Pete v. State*, No. 07-03-00037-CR, 2004 Tex. App. LEXIS 2576, at *12-13 (Tex. App.—Amarillo March 23, 2004, no pet.) (not designated for publication) (holding that Pete encouraged the commission of the crime for purposes of rendering him a party by driving the party possessing the drugs to the place where the drugs were acquired and to another location where they were sold). Unlike entrapment, nothing in the plain meaning of that word restricts its focus solely to the circumstances existent at the inception of the relationship between two parties. Indeed, one can inspire, persuade, help, or advise another even after the other already committed to act.

This distinction between the two words or concepts is of import because McKinley did not say in his article that Darby "entrapped" McKay or Crowder. Rather, he said Darby "encouraged" the plot. All Darby's allusions to evidence about McKay recanting or being found to have obstructed justice by lying are irrelevant, since they relate to McKay's claim of entrapment. In short, potentially knowing that Darby did not

entrap McKay does not mean he also had doubts about whether Darby encouraged him. The trial court did not err in granting McKinley and his employer summary judgment on the issue of actual malice. This coupled with Darby's undisputed status as a public figure relieves us from having to address any other issue raised by appellant. The summary judgment is affirmed.

Brian Quinn<br>
Chief Justice

Campbell, J. Concurring and dissenting

Pirtle, J. Concurring and dissenting

# EXHIBIT 1

**The New York Times** Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



February 22, 2011

# Anarchist Ties Seen in '08 Bombing of Texas Governor's Mansion

**By JAMES C. McKINLEY Jr.**

HOUSTON — It has been two and a half years since an arsonist tossed a firebomb into the governor's mansion in Austin and slipped into the night, but the Texas Rangers say they are finally closing in on the person responsible.

Steven C. McCraw, the head of the Department of Public Safety, said on Friday that investigators had linked the arsonist to a group of anarchists known as Austin Affinity. He said two members of the same group had pleaded guilty to making and possessing gasoline bombs during the 2008 Republican National Convention in St. Paul, Minn., three months later.

But one of the men who pleaded guilty in Minnesota said the anarchist group that the rangers are focusing on did not exist. The man, Bradley Crowder, said it was an ad hoc collection of young anarchists who had pooled resources to hire a van for the trip north.

"It was like an activist car pool," said Mr. Crowder, who is 25 and served two years in prison for his role in making eight gasoline bombs in wine bottles, which were never used.

The rangers, however, see things differently. A break in the case came several months ago, they said, when a ranger who was helping review thousands of hours of surveillance tapes from 11 cameras around the Capitol and mansion spotted something strange.

Four days before the fire, three men in a white Jeep Cherokee stopped in front of the mansion about 2 a.m. and a person in the back seat snapped photos of the building. The ranger thought the men might have been casing the place.

But the video camera did not capture the license plate number. So the police began a painstaking hunt through 3,000 similar Jeeps in Texas, eliminating them one by one, Mr. McCraw said. "Every one of them had to be looked at," he said, "and it had to be done in a way that you are not letting the person know."

"It was good, old-fashioned police work," he said. "Sometimes it's the minutiae and the tedious that links you to something."

000015

Months later, investigators found the car and interviewed the owner, who turned out to have a connection to people who were part of the Austin Affinity anarchist group, Mr. McCraw said. The owner also identified the two passengers, one of whom was near the mansion at the time of the fire.

All three men in the Jeep have been questioned in connection with the arson and are considered suspects, though they have denied involvement, the police said.

Mr. McCraw said the arsonist is believed to be a fourth person, whose shadowy figure can be seen in video taken by another camera the night of the fire. Released last week, the video shows the figure tossing a blazing gasoline bomb onto the porch of the mansion, then sprinting away. A third camera on an adjacent street captured a grainy image of his face. The police enhanced the picture electronically and released a sketch based on it.

The fire destroyed much of the historic two-story brick home across from the Texas Capitol where governors have lived since 1856. Renovations continue, but Gov. Rick Perry has been moved to other lodgings. For two years, the search for the culprit has been a priority for the rangers and the state police, and the lack of progress had been an embarrassment for the department.

In recent days, rangers in their trademark cowboy hats have fanned out across Austin and penetrated the city's counterculture hangouts, where the fashion accessories tend toward piercings and tattoos, the music is alternative rock and globalization is a dirty word. Toting pictures of suspects and offering a $50,000 reward for leads, the lawmen have questioned several self-described anarchists about the Affinity group and the identity of the bomber.

Not surprisingly, the investigation has been met with some suspicion. Many self-described anarchists in Austin do not advocate attacking all forms of government, a concept they regard as dated. Their vision of anarchism holds that people should take action themselves to fix social problems. Local anarchists run a recycling center, a food-distribution program, a bookstore, a cafe, and even a thrift shop.

Yet federal agents accused two men from these circles of plotting to make firebombs and hurl them at police cars during the convention. An F.B.I informant from Austin, Brandon Darby, was traveling with the group and told the authorities of the plot, which he had encouraged.

David Guy McKay, 24, pleaded guilty to firearms violations in the case and was sentenced to four years. Mr. Crowder, 25, received a two-year sentence after pleading guilty to aiding and abetting Mr. McKay in the possession of an illegal firearm, which is how the law classifies a gasoline bomb.

000016

Mr. Crowder, who is living and working in Austin, said he had nothing to do with the mansion fire. He called the theory that there was an anarchist organization behind both crimes "categorical nonsense." "It never existed," he said. "It's not a real entity."

Scott Crow, an Austin anarchist who knows Mr. Crowder and Mr. McKay but did not go to St. Paul, said the state police were "grasping at straws." He said the group that had traveled to Minnesota was never a coherent organization and split up on returning.

"Anarchist groups, you know, they have no leader," Mr. Crow said.

000017